# EXHIBIT A



**WILCOX & FETZER LTD.**

In the Matter Of:

Johnson

v.

Wal-Mart Stores, Inc.

C.A. # 04-1450 JJF

Transcript of:

Cassandra Johnson

May 24, 2005

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CASSANDRA JOHNSON,              )
                                )
            Plaintiff,          )
                                )   Civil Action
    v.                          )   No. 04-1450 JJF
                                )
WAL-MART STORES, INC., a        )
Delaware corporation,           )
                                )
            Defendant.          )

         Deposition of CASSANDRA JOHNSON taken
pursuant to notice at the law offices of Ballard Spahr
Andrews & Ingersoll, LLP, 919 Market Street, 12th Floor,
Wilmington, Delaware, beginning at 10:10 a.m. on Tuesday,
May 24, 2005, before Kathleen White Palmer, Registered
Merit Reporter and Notary Public.

APPEARANCES:

        NOEL E. PRIMOS, ESQUIRE
        SCHMITTINGER & RODRIGUEZ, P.A.
          414 South State Street
          Dover, Delaware   19901
          for the Plaintiff
        FARRAH I. GOLD, ESQUIRE
        BALLARD SPAHR ANDREWS & INGERSOLL, LLP
          1735 Market Street - 51st Floor
          Philadelphia, Pennsylvania   19103-7599
          for the Defendant

------------------------------------------------

                    WILCOX & FETZER
       1330 King Street - Wilmington, Delaware 19801
                     (302) 655-0477

Johnson                                       v.                      Wal-Mart Stores, Inc.
Cassandra Johnson          C.A. # 04-1450 JJF                         May 24, 2005

Page 6

1  A. 1991.
2  Q. Did you go to college?
3  A. For two years.
4  Q. Where did you go?
5  A. Delaware State.
6  Q. Did you earn a degree there?
7  A. No.
8  Q. What did you study?
9  A. Accounting and business.
10 Q. Great. Did you like it?
11 A. I did.
12 Q. You did, I guess, no postgraduate work after
13 that?
14 A. No.
15 Q. Where did you work prior to Sam's Club?
16 A. I worked as a temp, I believe.
17 Q. Was that your first job before Sam's Club?
18 A. No.
19 Q. What was your first job, I guess, out of
20 college, if you can recall? And if you can't, give me
21 the first thing you remember.
22 A. I really don't remember. I really don't
23 remember my first job out of college.
24 Q. Okay.

Page 7

1  A. Because I was working like two or three jobs
2  when I was going to college, so --
3  Q. What were you doing while you were in college?
4  A. I was a student worker. I worked at Sears
5  and -- I believe I was working at a temp service for
6  Playtex.
7  Q. What were you doing at Sears?
8  A. I did credit solicitation for Discover.
9  Q. So making phone calls?
10 A. Actually, it was one on one. It was in the
11 store.
12 Q. What kind of job duties did you have associated
13 with that?
14 A. That was it. That was my main responsibility
15 then.
16 Q. Okay.
17 A. I don't think I did anything else other than
18 that.
19 Q. You said you worked for a temp service for
20 Playtex. What kind of job duties did you have there?
21 A. When I worked for Playtex, I believe all I did
22 was pack bras and panties.
23 Q. How long did you do those things?
24 A. Probably about maybe a year.

Page 8

1  Q. Then what did you do after college?
2  A. I was unemployed probably about a year and a
3  half, maybe two years.
4  Q. Were you doing anything in that time?
5  A. Yes. I believe that was around the time my mom
6  had her first heart attack.
7  Q. Then you started working again?
8  A. Yes.
9  Q. Okay.
10 A. I started working -- I did residential aid for
11 Kent Crest. It was assisted living for mentally
12 retarded.
13 Q. What did you do there?
14 A. I worked the overnight shift, mainly helped with
15 baths, meds and eating, helping them get ready for Easter
16 Seals.
17 Q. Why did you leave each of those jobs, going back
18 to Sears, I guess, and then --
19 A. Sears, it was basically seasonal.
20 Q. Okay.
21 A. Same with the others except for Kent Crest. I
22 left Kent Crest because they were accusing me of some
23 things that I didn't do, so --
24 Q. What were they accusing you of?

Page 9

1  A. Of client abuse. And at the time there was
2  another girl indicated and she was the one who was doing
3  it.
4  Q. That's a shame.
5     What did you do after Kent Crest?
6  A. (No response.)
7  Q. How long were you at Kent Crest?
8  A. Probably about -- probably about a year, I
9  guess.
10 Q. Okay.
11 A. Maybe a little longer. I'm really not sure.
12 Q. Approximate is fine.
13 A. Probably after that I was out of work for about
14 a year, and in that year I think I worked at the temp
15 service again. I think I did work at the temp service
16 again. And that was mostly Playtex because that's what
17 was there at the time. And after that that's when I
18 started Sam's Club.
19 Q. When did you start at Sam's? Do you remember?
20 A. September of '96.
21 Q. Going back to your previous experience, did you
22 ever work before as a cashier before Sam's?
23 A. Fast food when I was in high school.
24 Q. Ever with tires at all?

| Johnson | | Wal-Mart Stores, Inc. |
|---|---|---|
| Cassandra Johnson | v. C.A. # 04-1450 JJF | May 24, 2005 |

Page 10

1   A. No.
2   Q. Did you ever experience any sex discrimination
3   or harassment in your previous jobs?
4   A. No.
5   Q. So did you ever complain about discrimination or
6   harassment in your previous jobs?
7   A. No.
8   Q. Did you ever experience any retaliation in those
9   previous jobs?
10  A. No.
11  Q. Were you ever disciplined or warned in any way
12  at those jobs?
13  A. No.
14  Q. I guess you said at Kent Crest, though,
15  eventually you had been terminated because you were
16  accused of something; is that correct?
17  A. Yes.
18  Q. Were you disciplined for that or --
19  A. No.
20  Q. So now starting with Sam's Club, you said you
21  started at Sam's in September of 1996; is that correct?
22  A. Yes.
23  Q. What was your position at that time?
24  A. I was a cashier.

Page 11

1   Q. Where in the store?
2   A. In the front as a regular cashier, regular
3   checkout.
4   Q. Who was your supervisor at that time?
5   A. (No response.)
6   Q. I know we are reaching back some time now. If
7   you recall.
8   A. I want to say -- I want to say Michelle Jones.
9   Q. What were your job duties as a front end
10  cashier?
11  A. It was whatever was required. If I cashiered,
12  at night when I closed. If the cart guy needed help, I
13  helped the cart guy. If we needed to go out on the floor
14  and straighten clothes or sweep the floor -- whatever
15  needed to be done, that's what we did.
16  Q. You say "we." Who else?
17  A. As a group of cashiers. Nobody of the people I
18  started with are still there.
19  Q. Did you get along with those people that you
20  worked with?
21  A. Yes, most of the time.
22  Q. What would you say you spent the majority of
23  your time doing as a front end cashier?
24  A. Cashiering.

Page 12

1   Q. So most of it was up at the cashier itself?
2   A. Yes, it was.
3   Q. Did you all perform the same job duties as the
4   other cashiers? Would you all perform the same duties?
5   A. Mostly, yes.
6   Q. Would you work the same hours?
7   A. No, no. It varied from seven in the morning
8   till three, or ten to six, nine to five, whatever was
9   needed, and closing.
10  Q. Would you work any of those shifts?
11  A. Yes.
12  Q. Or did you have any regular type of shift?
13  A. No. At the time I didn't have any kids, so it
14  was -- I had open availability.
15  Q. Would you socialize with your coworkers, would
16  you say? Joke around with them at all?
17  A. At work, yes. After work, no.
18  Q. Did you ever change positions while you were at
19  Wal-Mart, Sam's Club?
20  A. I trained as a service runner. I did refunds.
21  And then I went back to cashiering.
22  Q. Now, you said you were trained as a service
23  runner. What exactly is that?
24  A. Supervisor of the cashiers.

Page 13

1   Q. Did you ever act as a supervisor of the
2   cashiers?
3   A. Yes.
4   Q. For how long did you do that?
5   A. Probably a month or two before I went to refunds
6   and exchanges.
7   Q. Why did you stop serving as --
8   A. Because there was another girl that was training
9   with me and they thought her better suited for it, so
10  they gave it to her and I just moved to refunds.
11  Q. Was that a supervisory position, as well, in
12  refunds?
13  A. No.
14  Q. So what were you doing in refunds?
15  A. At the time it was a stock area for, I believe,
16  some electronic stuff. So, you know, some of the
17  high-theft merchandise that was in the cages, we would
18  unlock and pass out or -- that was it. Refunds.
19  Q. Who did you supervise as a service runner?
20  A. Just cashiers.
21  Q. Are any of those people still there?
22  A. No.
23  Q. Did you get along with those people? Any
24  problems?

4 (Pages 10 to 13)

Wilcox & Fetzer, Ltd.        Professional Court Reporters        (302)655-0477

| Johnson | | Wal-Mart Stores, Inc. |
|---|---|---|
| Cassandra Johnson | v.<br>C.A. # 04-1450 JJF | May 24, 2005 |

### Page 18

1  they were short, I would go over and cross-trained.
2  Q. What are your job responsibilities as a tire
3  cashier?
4  A. As a tire center cashier, I ring tires. I do --
5  Q. Did you say "ring"?
6  A. Yes. I'm sorry. I ring tires. I do special
7  orders on tires. And I'm supposed to have general
8  knowledge of the merchandise I sell.
9  Q. So you sell the merchandise?
10  A. Yes.
11  Q. Do you work on cars?
12  A. I'm trained to. I have.
13  Q. You have?
14  A. I have.
15  Q. How long would you say you spend each day doing
16  which duties?
17  A. I don't do the physical work on the car every
18  day.
19  Q. Okay.
20  A. It's been times when we have everybody call out
21  except for myself, the cashier, and one guy in the tire
22  center or it's the end of a shift and there's one guy in
23  the tire center and myself, and then I will go out and
24  help. If he looks like he's backed up or -- it's

### Page 19

1  supposed to be two people in the tire shop at all times,
2  and it's rarely ever that way.
3  Q. So how often do you have to go back there, would
4  you say, in a week, let's just say? Is it every week?
5  A. Fully staffed, maybe two or three times, maybe,
6  because someone is on a break or something and there's
7  one other guy in the shop. Before we were fully staffed,
8  often. At least three or four times a week just doing my
9  regular duties and running back and forth to make sure
10  the guy in the shop was still safe.
11  Q. Would he be doing the physical labor at that
12  point?
13  A. It depends. If he's got a car and there's a
14  tire on the rim that needs to be mounted, I can do that.
15  Q. You said you trained to become a tire
16  technician. When did you do that?
17  A. On the days that they were short staffed and I
18  went over to help out.
19  Q. Okay.
20  A. But before I could even move to that area, it
21  was a case of my manager at the time telling me I
22  couldn't transfer out of his department till he filled my
23  spot. And then it was when I moved to that area, if I
24  wanted to stay in that area, I would have to certify in

### Page 20

1  that area. So the team leader at the time gave me a
2  notebook and told me to read it, and then I had to take a
3  test after I read the notebook.
4  Q. Just back up for one second.
5      You said your supervisor wouldn't let you
6  out of the area. Do you mean in refunds?
7  A. Refunds, yes.
8  Q. So were you talking about Tom then?
9  A. No. By that time it was George Bailey.
10  Q. Did you get along with Mr. Bailey?
11  A. I suppose.
12  Q. So for a while you were kind of in between?
13  A. Yes.
14  Q. Then you came into the tire department, you
15  said, you think the spring of 2001?
16  A. Probably so.
17  Q. Is that when you came in formally? You mean
18  that's when you made the move?
19  A. That's when I made the move.
20  Q. Once you made the move into the tire department,
21  when is it that you started training to become a tire
22  technician?
23  A. Immediately. I mean, like I said, he gave me
24  the notebook. I needed to know how to do what I do.

### Page 21

1  Q. Okay.
2  A. The notebook wasn't on just how to ring a tire
3  up. I knew how to do that. It was the tire area itself.
4  Q. You said "I." Who were you talking about?
5  A. Ron McReynolds.
6  Q. Was he your supervisor when you first came?
7  A. At the time, yes. He was my team leader.
8  Q. Can you explain to me a little about what a team
9  leader is?
10  A. I guess Wal-Mart's chain of command is general
11  manager, manager, and then team leader. So my team
12  leader is the person that's, you know, directly
13  accessible to me every day in my area.
14  Q. Then who is below a team leader?
15  A. The workers.
16  Q. So you?
17  A. Yes.
18  Q. Did you get along with Mr. McReynolds, did you
19  say?
20  A. Yes.
21  Q. So you started training. Then did you need some
22  type of special certification to be a tire technician?
23  A. That was what the notebook was for, to certify
24  me in mounting tires.

Page 22

1  Q. When did you get that certification?
2  A. Probably the same spring I started working in
3  that department.
4  Q. You think it was in 2001?
5  A. Yes.
6  Q. Are you sure that's when it was?
7  A. It was whenever I started because I remember he
8  gave me the black notebook and I had to take the test.
9  Q. There was a test?
10 A. Yes. At the end of the notebook he gave me a
11 little test, told me to fill it out, and I gave it back
12 to him.
13 Q. Who else was back there?
14 A. Very high turnover rate.
15    I believe when I moved to that department
16 there was a guy named Jeff, Nate, Dave Moffitt.
17 Q. Is Moffitt someone else or is it Dave Moffitt?
18 A. It's Dave Moffitt.
19 Q. Okay.
20 A. A guy named Kevin Rash. It's been so long
21 because most of those guys are gone except for Nate and
22 Kevin. Michael Hunt was there. Oh, my God. We got a
23 lot of guys come and go. I can't remember all of them.
24 Q. Were they tire cashiers or tire technicians?

Page 23

1  A. No. Just tire technicians.
2  Q. These are all tire technicians?
3  A. Yes, except for Mike Hunt. Mike Hunt used to be
4  a cashier, also.
5  Q. So if you're formally a tire technician, are you
6  performing different job duties than if you are a tire
7  cashier?
8  A. I assume so because they're not required to ring
9  a tire. They don't even have -- what they have, like
10 passwords to sign on to the register. So if you are not
11 keyed in to do it, you don't do it.
12 Q. But they spend most of their time working on the
13 cars?
14 A. Yes.
15 Q. Would you say you got along with the people that
16 you worked with?
17 A. I got along with everybody back there.
18 Q. Joke around with them at all?
19 A. Not really because at the time they were
20 separated from me. There was an enclosed area for myself
21 and then they were out into the shop.
22 Q. Now, was your supervisor the same the whole time
23 you were back in the tire department or has it been the
24 same?

Page 24

1  A. No. Probably -- it probably changed in 2000 --
2  probably about 2001, 2002, maybe. It went from
3  Mr. McReynolds to another guy named Dave, and then after
4  Dave a guy names Robert McKlinsey.
5  Q. These were the team leaders that you were
6  talking about?
7  A. Yes, yes.
8  Q. Did you get along with Dave?
9  A. All of them.
10 Q. Was there anyone after Robert McKlinsey?
11 A. The last guy was Mr. Revis.
12 Q. Did you get along with Mr. Revis?
13 A. No.
14 Q. No? What was the problem with Mr. Revis?
15 A. When Mr. Revis came in, he transferred in just
16 as a regular tire tech from Sears. And when he came in,
17 he came straight in with jokes all day long, every day.
18 Just obnoxious, all day long, every day.
19 Q. Now, was he in your area? You said he was a
20 tire technician?
21 A. Yes.
22 Q. So was he back working in the cars?
23 A. By the time he came in, we already had a remodel
24 and my area was only separated by a window. But when I

Page 25

1  was ringing tires before, the member would go out on the
2  floor, bring the tire to the tire center. Now I pull the
3  tires, I take them out to the tire techs.
4  Q. How often is that?
5  A. Every day. Whenever I make a sale.
6  Q. How often would you say you make a sale?
7  A. It's a lot considering this year we got high
8  sales, so -- for the region, so it's a lot.
9  Q. "A lot" is kind of general. If you could be a
10 little bit more specific.
11    Would you say you go back there five times
12 a day? Ten times a day? Is it less than that? More
13 than that?
14 A. It would be more than that.
15 Q. More than --
16 A. I'm more than sure I ring more than -- more than
17 ten sales a day.
18 Q. When is it that you say Mr. Revis came in?
19 A. Probably in maybe the end of last September.
20 Q. Last September, 2004 or 2003?
21 A. 2003.
22 Q. You said he would make jokes. What kind of
23 jokes?
24 A. At first -- they weren't even aimed at me when

**Page 26**

1  he first came in. It was just really -- he was just
2  really obnoxious and just told jokes all day. But I
3  guess after a while when he noticed I wasn't laughing at
4  the jokes, then it became -- they started being aimed
5  towards me.
6      Q. What kind of things would he say?
7      A. A joke about me being a bear -- or I'll tell you
8  exactly what it was. One day I had been outside and I
9  was sweating because it was hot and my back was itching.
10 So I didn't ask any of the guys to scratch my back, so
11 there's a pole behind my register and I was rubbing my
12 back against the pole. He said, "That's what bears do."
13 So, I mean, after a while it started being little snide,
14 gentle comments to being directly aimed at me.
15     Q. Okay.
16     A. And they were demeaning in a way that before he
17 came I didn't have to worry about my coworkers laughing
18 behind me back. If they did, they did it discreetly. At
19 least I didn't have to hear it.
20     Q. You said he would make jokes to everyone,
21 though. Did he make jokes to other people, as well?
22     A. As far as I know, he told jokes to them. I
23 don't know what they were about because most of the time,
24 just simply because I didn't care for the way he carried

**Page 27**

1  himself, I didn't hang around. I would just generally
2  walk away unless there was something that I had to deal
3  directly with him about.
4      Q. Would Mr. Revis ever say anything about you
5  being a female to you?
6      A. No.
7      Q. When you first started at Sam's Club, did you
8  receive an associate handbook?
9      A. Yes.
10     Q. If you could just take a look at this. I know
11 they are usually pretty and colorful. If you could tell
12 me if this is generally what it looked like.
13     A. Yes, it does.
14     Q. Did you have to sign an acknowledgment when you
15 got that handbook?
16     A. I believe so. Each book had an acknowledgment
17 in the back of it.
18     Q. Does that look like what you saw?
19     A. Yes.
20         MS. GOLD: I would like to mark this as
21 Exhibit 1, please.
22         (Johnson Exhibit 1 was marked for
23 identification.)
24

**Page 28**

1  BY MS. GOLD:
2      Q. Miss Johnson, have you ever seen a job
3  description for a tire cashier?
4      A. Yes.
5      Q. Can you tell me if this is what you've seen?
6      A. Yes, it is.
7         MS. GOLD: Can you please mark this as 2?
8         (Johnson Exhibit 2 was marked for
9  identification.)
10 BY MS. GOLD:
11     Q. Can you take a second to read that over and can
12 you tell me, do you think this accurately describes what
13 you do?
14     A. Yes.
15     Q. Have you ever seen a job description for a tire
16 technician?
17     A. Yes.
18         (Johnson Exhibit 3 was marked for
19 identification.)
20 BY MS. GOLD:
21     Q. Can you tell me if this is what you've seen?
22     A. (The witness reviews the document.) Yes.
23     Q. Is this an accurate description of what tire
24 technicians do?

**Page 29**

1      A. No.
2      Q. This is not?
3      A. No.
4      Q. Can you tell me what it is that's not accurate?
5      A. Just looking, sell merchandise. None of those
6  guys sell merchandise. Some of the guys they have there
7  are what they call rookies. I mean, they know how to
8  mount a tire, but they're mounting whatever I put out
9  there. If you went in and you needed a specialized tire
10 because you had a performance car or your car required a
11 certain tire, they don't -- some of those guys don't know
12 that.
13     Q. Okay.
14     A. I mean, when they come in, they don't send them
15 down and say, okay, this is a tire specifically designed
16 for this, this, and this. They don't do that. They
17 teach them how to mount a tire. That's it.
18     Q. So they're doing more of the physical labor?
19     A. Yes.
20     Q. Would you say you're doing less of the physical
21 labor; is that correct?
22     A. Yes.
23     Q. So would you say that the tire cashier
24 description is more accurately what you do or do you

Page 30

1  contend that you do these tire technician functions?
2  A. Technically I do the tire technician, too.
3  Other than basically mount a tire, that's the only thing
4  I don't do. I sell the tire. I know the merchandise. I
5  sell memberships and credit. I do all the stocking.
6  Those guys, when they come out and stock in the morning
7  when we get tires in, if we don't have anybody to unload
8  the truck, I go back and count the tires that come off
9  the truck. When they come to the tire center, I help
10 stock those tires.
11 Q. Okay.
12 A. Merchandise -- yes, I straighten tires. I do
13 the signs for the tires. Some of the guys in the shop
14 aren't required to do that.
15 Q. Are there any things that they have to do that
16 you don't have to do?
17 A. Be physically prepared every morning to put a
18 tire on a car. That's it.
19 Q. What is your understanding of how employees at
20 Sam's Club are paid? When you come in and you get your
21 initial pay rate, what's your understanding of how that's
22 set?
23 A. I'm sorry.
24 Q. I apologize. It might be a little confusing.

Page 31

1  When you come to Sam's Club and you apply
2  for a position and they tell you what you are going to be
3  making, what's your understanding of what that's based
4  upon?
5  A. From my understanding, I always thought it was a
6  general scale that either the cashiers came in making a
7  general amount of money, the tire center came in making a
8  general amount of money, the meat department makes a
9  general amount of money. I always figured that that's
10 how the scale went.
11 Q. Do you know whether experience, previous
12 experience would ever play into that?
13 A. I doubt very seriously if it would.
14 Q. Do you know whether it does?
15 A. Not for sure, no.
16 Q. Now, how about pay raises? Do you know what
17 kind of pay raises there are at Sam's Club?
18 A. Generally the only pay raises we get are every
19 year when we get our eval.
20 Q. So that's once a year.
21 A. That's once a year. And anything in between
22 would be -- I'm sorry. Anything in between would be
23 considered a merit raise, and supposedly they aren't
24 given that often. It's at the general manager's

Page 32

1  discretion.
2  Q. Who is it that sets your rate of pay?
3  A. I don't know.
4  Q. Who is it that does your annual evaluations?
5  A. Whoever my team leader is at the time.
6  Q. So is it the team leader that will decide what
7  kind of raise you get?
8  A. Basically.
9  Q. Or is that the store manager?
10 A. Basically it's the team leader because they sit
11 down and write your eval. And of course after they write
12 it, a member of management has to sign it, so...
13 Q. So a member of management does have to approve
14 it?
15 A. Yes.
16 Q. Any other kinds of pay raises?
17 A. Not that I know of, no.
18 Q. Would you ever discuss your pay with anyone?
19 A. We are not supposed to.
20 Q. There's a policy about that?
21 A. As far as I know, there's a policy that we don't
22 discuss our pay scales.
23 Q. So would anyone discuss their pay with you?
24 A. No.

Page 33

1  Q. I'm going to show you a document. Take a minute
2  to read it over.
3       MS. GOLD: We are on Exhibit 4.
4       (Johnson Exhibit 4 was marked for
5  identification.)
6  BY MS. GOLD:
7  Q. Do you recognize this document?
8  A. Yes, I do.
9  Q. Can you tell me what it is?
10 A. It is my complaint to the Department of Labor.
11 Q. Did you review the allegations before you would
12 sign this?
13 A. Yes.
14 Q. Is that your signature at the bottom?
15 A. Yes.
16 Q. Let me show you another document.
17      (Johnson Exhibit 5 was marked for
18 identification.)
19 BY MS. GOLD:
20 Q. Do you recognize this document?
21 A. No, I don't.
22 Q. This is not familiar to you?
23 A. No.
24 Q. Can you look at page 2 and then again on page 3,

9 (Pages 30 to 33)

Page 42

1  it went on.
2  Q. You said when you first called the 800 line.
3  When was that?
4  A. It's been a little over a year, I guess.
5  Q. Now, going back just one minute, any of the
6  other people -- Mr. Bromley, Mr. Randolf, Mr. Stone and
7  now Miss Kennedy -- are you claiming that they ever were
8  there when Mr. Revis was joking with you?
9  A. Not one-on-one to witness, but Deborah, Jeremy,
10 and Cornell all had firsthand knowledge of it and, in
11 fact, he admitted to doing it in front of Deborah and
12 Jeremy Stone.
13 Q. But that's the firsthand knowledge you are
14 talking about?
15 A. Yes.
16 Q. Because you told them about it?
17 A. Yes.
18 Q. Okay.
19 A. Then he admitted to it in front of those.
20 Q. What is it that he admitted to doing?
21 A. That he was making the comments and that he was
22 sorry, he didn't really think I was taking them
23 personally.
24 Q. The comments you are talking about are him

Page 43

1  calling you a bear?
2  A. The fat jokes. It wasn't just that one bear
3  joke. It was a lot of jokes. And then making fun of me
4  to my coworkers. And it's hard enough having, you know,
5  men respect you in an all-man field, but he was making
6  the situation worse with his jokes, and even doing it
7  behind my back to my coworkers.
8  Q. How do you know he was doing it to your
9  coworkers?
10 A. Because they was bringing it to my attention.
11 Q. What did they tell you?
12 A. On one instance there was a guy, Gary Johnson,
13 and Greg Scott who he made some comments to and they came
14 to me. I was like, you know, we told him that, you know,
15 that that crap's not funny and he should stop. He was
16 like, you probably really should complain. I was like,
17 well, he said it to you, basically. If you don't
18 complain and say this is -- if they don't do the
19 complaining, it just looks like I'm a girl in their
20 department complaining about my team leader.
21    So I knew it wasn't going to do any good
22 because I knew I was already making complaints about him
23 making the comments and nothing was being done.
24 Q. Now, what jokes did they say he made?

Page 44

1  A. I can't even remember, but I'm more than sure I
2  wrote it down and gave it to my attorney. I'm sure I
3  did. Because I was keeping a journal. It was hard to
4  keep up with it because, like I said, it was constant and
5  they were malicious.
6  Q. You said you were keeping a journal?
7  A. I did.
8  Q. All right. We'll get to that.
9     So was there anyone else that you claim
10 would come to you and told you about jokes?
11 A. Other than Gary and Greg, no.
12 Q. The jokes, did they ever say it was because you
13 were a female?
14 A. No.
15 Q. Okay.
16 A. No, because they were always fat jokes.
17 Q. Would they say that he made jokes to other
18 people, as well?
19 A. No. If it didn't pertain to me, why would they
20 tell me?
21 Q. The next person you named is Lakeria Bryant.
22 A. Yes.
23 Q. Who is she?
24 A. She is the front end area manager.

Page 45

1  Q. Was she your manager when you were in the front
2  end?
3  A. At the time, no, she wasn't my direct manager,
4  but she's a manager in the club. So if my manager isn't
5  available, she would be there. She's a member of
6  management.
7  Q. What information does she have about your
8  claims?
9  A. She basically -- basically she witnessed him one
10 day insult me in front of a female customer and she, you
11 know, said, "Really, you shouldn't do that." But when I
12 said, "Lakeria, look, this is ongoing. Somebody needs to
13 say something to him about it." And she said, "Okay.
14 I'll say something to Jeremy." Nothing was said, so I
15 went to Jeremy myself.
16 Q. What did Jeremy say to you?
17 A. He said he would deal with it. And I think
18 within the next couple of days he had Johnny and the
19 coaches all fix with myself and say basically the reason
20 for this meeting is because Cassandra feels picked on.
21 So right then when he said it, it made me feel like he
22 was trying to belittle me and make light of the
23 situation.
24 Q. You thought Jeremy was trying to make light of

Johnson                              v.                         Wal-Mart Stores, Inc.
Cassandra Johnson              C.A. # 04-1450 JJF                    May 24, 2005

Page 54

1  than sure that some of the instances I claimed about
2  Mr. Revis, his basic discrimination against me and saying
3  the jokes he was saying as opposed to Wal-Mart has a no
4  tolerance policy for, so -- no. There's nothing else
5  that I have.
6      Q. About how many entries do you think you had in
7  your journal?
8      A. Up until probably ten to 15 because after a
9  while I basically tried to not focus on that anymore.
10     Q. Do you recall approximately when these entries
11 were made?
12     A. Mostly -- probably about a year ago.
13     Q. Okay.
14     A. And again, like I said, I was basically at this
15 point just trying not to focus. My hair was falling out.
16 I was stressful. I mean, I just -- it just started
17 taking over, so...
18     Q. What kind of things would you write in the
19 journal?
20     A. If I was really mad, most of the time I wrote
21 exactly what happened to me and that would be it.
22     Q. Which was --
23     A. What was said and who said what and how I felt
24 about it at the time.

Page 55

1      Q. You said what was said and who said what.
2         Was there anyone other than Mr. Revis that
3  made comments to you?
4      A. No.
5      Q. Okay.
6      A. No.
7      Q. What kind of things were said?
8      A. Just the general jokes and the treatment I was
9  getting from him and from Jeremy.
10     Q. That's what you've described earlier?
11     A. Yes.
12     Q. Any other jokes that stand out in your mind?
13     A. No, because all of them were hurtful. I mean --
14     Q. Were they all based on your weight? Is that
15 what you are saying?
16     A. Yes, yes.
17     Q. Okay.
18     A. Not -- it became -- it just got to the point
19 where it made me focus on me a lot more. I mean, I was
20 already going to work clean, in a clean uniform, and I
21 was dressed appropriately, but I still -- I still wasn't
22 good enough. You know?
23     Q. But is it your contention that you were the only
24 one that was being joked to?

Page 56

1      A. Yeah. There were no other fat women in the
2  department, so it couldn't have been aimed at anyone but
3  me.
4      Q. Were there any other fat men in the department?
5  I know "fat" is a very general term.
6      A. Not all of them were physically fit. In fact,
7  Mr. Revis is not poster board material.
8      Q. Would he ever make jokes about himself?
9      A. No.
10     Q. Would he ever make jokes about anyone else in
11 the department?
12     A. Yeah.
13     Q. Okay.
14     A. Yeah.
15     Q. On that, who else did you hear him make jokes
16 about?
17     A. I guess -- I guess just general jokes to some of
18 the guys out there whether somebody was moving too slow
19 or wasn't keeping up with everybody else. But it wasn't
20 a malicious I'm-trying-to-hurt-your-feelings type of
21 joke.
22     Q. You think Mr. Revis was intentionally trying to
23 hurt your feelings?
24     A. I believe Mr. Revis was intentionally trying to

Page 57

1  hurt my feelings. And basically I believe it was
2  Mr. Revis knew I knew more than him as far as some of the
3  Sam's Club things that we needed to do in our area, like
4  the inventory and stuff like that. And I basically think
5  he was just trying to belittle me because he felt small
6  himself.
7      Q. But you think that directly had to do with the
8  fact that you are a female?
9      A. Yes.
10     Q. Why is that?
11     A. In all the time that he was back there, I don't
12 ever remember anybody being upset over him saying, you
13 know, any type of joke to them.
14     Q. But does that mean that they weren't upset? Do
15 you know whether they were upset?
16     A. I never physically went out and asked anybody
17 "Were your feelings hurt?" because it didn't affect me.
18     Q. I'd like to show you your complaint in this
19 matter, if you can take a minute to look that over.
20        (Johnson Exhibit 9 was marked for
21 identification.)
22 BY MS. GOLD:
23     Q. Do you remember this?
24     A. (The witness reviews the document.) Yes.

15 (Pages 54 to 57)

| Johnson | | Wal-Mart Stores, Inc. |
|---|---|---|
| Cassandra Johnson | v.<br>C.A. # 04-1450 JJF | May 24, 2005 |

Page 58

1  Q. This is your complaint in this matter?
2  A. Yes.
3  Q. Is this accurate, to the best of your knowledge?
4  A. To the best of my knowledge, yes.
5  Q. If I can turn your attention to paragraphs 14
6  and 16 of the complaint, in paragraph 14 you say that
7  defendant has refused to pay you equally to your male
8  coworkers, even though you possess more seniority than
9  some of your male coworkers; is that correct?
10  A. Yes.
11  Q. In 16 you say that the male coworkers who are
12  paid more than you despite having less seniority and that
13  they include Mr. Revis as well as tire mounter Memphis
14  and tire mounter Nathan Gibson; is that correct?
15  A. Yes.
16  Q. Now, when is it that you contend you were not
17  being paid equally to your male coworkers?
18  A. Well, Nate is no longer there and Mr. Revis is
19  no longer in my department, although I'm not sure if he's
20  still not keyed under our pay scale. I don't know.
21     As far as Memphis goes, I'm not really
22  certain of whether he ever made anywhere near what myself
23  and Nate and Mr. Revis made.
24     But in any case, Mr. Revis is, like I said,

Page 59

1  a talker, so of course he came in from Sears, so he,
2  himself, said that he was getting paid more than he made
3  at Sears and, of course, he blurted what he made.
4  Q. Now, let's go back for a second.
5     Before you were in the tire department, did
6  you believe that you were paid equally to your male
7  coworkers?
8  A. I didn't have any male coworkers.
9  Q. So you had all female coworkers before the tire
10  department?
11  A. Yes, yes.
12  Q. You came into the department, you're saying,
13  around the spring of 2001?
14  A. Yes.
15  Q. So is that the time frame that we are talking
16  about when you are saying these are the people that you
17  are comparing yourself to --
18  A. Yes.
19  Q. -- since then? Okay.
20     What's the basis for your claim --
21  A. Basically seniority has really nothing to do
22  with it because technically at Wal-Mart there is no such
23  thing as seniority. I guess time on the job really
24  doesn't matter with them.

Page 60

1  But as far as, you know, if it did matter,
2  Mr. Revis was making more money than me and I had been
3  there longer than him and I was doing my job and his.
4  Other than him going out there and physically putting on
5  a tire, which after probably about two months he didn't
6  have to do, anyway, because he came in as a tire mounter
7  and then probably about a month or so later they made him
8  the team leader.
9     So they didn't even wait his full 90 days
10  before they, you know, gave him a promotion, which,
11  again, with the little Wal-Mart handbook think, gee, you
12  supposed to wait 90 days, but they didn't. Oh, well.
13  Q. Do you know why?
14  A. No, I don't know why.
15  Q. You agree that seniority is not the basis for
16  pay at Wal-Mart?
17  A. No. I know the seniority has nothing to do with
18  it.
19  Q. Do you know what does have to do with it?
20  A. I'm assuming it would be your work performance.
21  Q. Do you know what Mr. Revis' work performance is
22  or was?
23  A. At the time -- again, he hadn't even made it to
24  his 90 days. They didn't know what he was capable of.

Page 61

1  They was going on based on the fact that he worked at
2  Sears and mounted tires there.
3  Q. But he did have previous experience mounting
4  tires?
5  A. Yes.
6  Q. Do you know what other qualifications Mr. Revis
7  had before Wal-Mart?
8  A. No.
9  Q. Do you know what his previous job experience
10  was?
11  A. No.
12  Q. Do you know what his education was?
13  A. No.
14  Q. While he was in your department, is it your
15  contention that he was performing the same exact job
16  duties as you were?
17  A. When he first came in, no. He was just a tire
18  mounter. Then like I said, maybe a month or two later
19  they made him a team leader.
20  Q. Okay.
21  A. And when he came in, no, he didn't know how to
22  do the team leader job, so it was my responsibility to
23  help him with it.
24  Q. But he came in as a tire technician?

16 (Pages 58 to 61)

Page 62

1  A. Yes.
2  Q. Not a tire cashier?
3  A. No.
4  Q. All of these people that you were talking about
5  were tire technicians; is that right?
6  A. Yes.
7  Q. Did you have the same schedule as Mr. Revis?
8  A. No, I don't think so. I kind of think when he
9  came in he was part-time, but I'm not certain.
10 Q. So you don't know what his hours were?
11 A. No.
12 Q. Do you know whether Mr. Revis had any attendance
13 problems?
14 A. How could he when he had only been there for two
15 months?
16 Q. In his whole time.
17 A. I really don't know.
18 Q. Do you have any personal knowledge of the
19 reasons that Mr. Revis received?
20 A. No, I don't.
21 Q. Have you ever seen Mr. Revis' evaluations?
22 A. No.
23 Q. How about Memphis? He was the next person you
24 claimed was earning more than you; is that correct?

Page 63

1  A. I really don't think Memphis was earning more
2  than me. I'm not certain. I never asked him. Like I
3  said, I didn't even ask Johnny or Nate what they were
4  making. It was just -- it was just -- I had an idea that
5  they were making more money than me.
6  Q. You had an idea based on --
7  A. Nobody else in my department was complaining
8  about needing a pay raise other than me. And then when
9  Nate finally did complain, he went to Cornell and asked
10 him for a merit raise and it was given.
11     So, you know, I'm thinking, well, if he can
12 get a merit raise, I'm, you know, working here in the
13 tire center and wherever else they need me to be and here
14 my performance should speak for itself. So I went and
15 asked for one, too, and couldn't get one.
16 Q. Now, do you know why other people might not have
17 complained about their raises?
18 A. Maybe they were satisfied with what they were
19 making.
20 Q. Now, do you know what Memphis' qualifications
21 were?
22 A. No. I think Memphis worked at Pep Boys before
23 he came to Sam's Club.
24 Q. So he did have some previous experience in the

Page 64

1  tire department?
2  A. Yes.
3  Q. Do you know what his level of education was?
4  A. No, I don't.
5  Q. Have you ever seen Memphis' evaluations?
6  A. No.
7  Q. Is it your contention that Memphis was
8  performing at the same job duties as you were?
9  A. No.
10 Q. Did he have the same schedule as you did?
11 A. I don't think so, no.
12 Q. Do you know whether he worked more or less than
13 you did?
14 A. I think Memphis was full time. I think he
15 started off part-time and then within a couple months
16 they probably made him full time.
17 Q. Are you full time?
18 A. Yes.
19 Q. So do you think you worked around the same
20 number of hours or --
21 A. Probably.
22 Q. Do you know whether Memphis had any attendance
23 problems?
24 A. I don't know.

Page 65

1  Q. Then the next person you had named was
2  Mr. Gibson; is that right?
3  A. Yes.
4  Q. Do you know how much Mr. Gibson was making?
5  A. No, not right off, no, I don't.
6  Q. Do you know what his previous experience was?
7  A. I think before Nate started there he was
8  unemployed and before that he was in jail.
9  Q. Do you know if he had any previous experience as
10 a tire technician?
11 A. No. Before that he was in jail for selling
12 drugs, so no.
13 Q. But do you know whether he did before that?
14 A. Nope.
15 Q. Had you ever seen Mr. Gibson's evaluations?
16 A. No.
17 Q. Do you know whether any of these individuals
18 were disciplined, received any discipline?
19 A. I don't know.
20 Q. Do you know, was Mr. Gibson working the same
21 number of hours as you?
22 A. He was full time, yes.
23 Q. Did he have any attendance problems, do you
24 know?

Page 66

1     A. I don't know that, either.
2     Q. Is there anyone else that you were claiming you
3 believed worked, performed substantially equal work that
4 you were and was receiving more money?
5     A. I kind of think Kevin Rash was. He had been
6 there for a while. He quit for a while. Came back.
7 Quit again. Came back. Quit again. Came back again,
8 so --
9     Q. But do you know what his pay was?
10     A. I think each time he left and came back he came
11 at the same rate of pay he left at.
12     Q. But do you know what that was?
13     A. No, I don't.
14     Q. Do you have any idea what his qualifications
15 were?
16     A. No, I don't.
17     Q. Do you have any idea what his previous
18 experience was?
19     A. No.
20     Q. Level of education?
21     A. I think Kevin graduated from Delaware State and
22 I do believe he majored in criminal justice. I'm not
23 sure.
24     Q. How about, have you ever seen Kevin's

Page 67

1 evaluations?
2     A. No.
3     Q. Do you know whether he had any attendance
4 problems?
5     A. No, I don't know.
6     Q. Do you know what his schedule was like?
7     A. I believe when he came back the first time he
8 was part-time and then the following times he was full
9 time.
10     Q. Was he also working as a tire technician?
11     A. Yes.
12     Q. Is there anyone else that was working as a tire
13 cashier?
14     A. There was an older gentleman, Mr. Carroll,
15 Carroll Stone, but his pay would not be anywhere near
16 mine. He would definitely make more money than me
17 because he is a charter partner, so he's like been there
18 since the store opened.
19     Q. So he's been there a real long time?
20     A. A really, really long time.
21     Q. Does he have a lot of experience, would you say?
22     A. He's just a cashier. That's it.
23     Q. But a lot of experience as a cashier?
24     A. He still doesn't do the duties that I do.

Page 68

1 Mr. Carroll was not even held accountable for the
2 computer system that we are supposed to use. He does not
3 know how to use it unless they've trained him here in the
4 last month that I've been out. And he doesn't do any
5 special orders on tires.
6     Q. Are you contending that you should be making --
7     A. No, nowhere near what Mr. Carroll works because,
8 again, he was there since the store opened, but there's
9 supposed to be nothing, you know, close to seniority.
10 But he's been there when they had a different pay scale
11 and they rated pay differently.
12     Q. Have you ever seen Mr. Stone's evaluations?
13     A. No.
14     Q. Do you know what his qualifications are?
15     A. No, I don't.
16     Q. Anybody else that you're contending earned more
17 than you that shouldn't have?
18     A. No. I really don't know.
19     Q. Now, can you look at paragraph 20 of the
20 complaint? Does paragraph 20 talk about what we had just
21 discussed? Does that cover what we had just discussed?
22     A. I suppose, yeah.
23     Q. Is there anyone else that you are talking about
24 that worked substantially equal to you but was paid

Page 69

1 higher wage rates?
2     A. Other than Kevin, I would have him more so than
3 Memphis.
4     Q. I would now like to turn your attention to
5 paragraph 15 of the complaint. You claim that on the
6 basis of your sex, you have not been given a merit raise.
7 What's the basis for that claim?
8     A. Again, I kept asking, you know, my immediate
9 manager, which was Jeremy, you know, did he think I could
10 get a merit raise. And he said we would sit down and
11 discuss it and the time never came. And he would talk to
12 Cornell about it and that time never came. And when I
13 went to Cornell about it, it was I would have to wait and
14 he would sit down and talk to me. And again, the time
15 never came.
16     Q. Now, when was it that you asked, when you first
17 asked?
18     A. It's been well over a year and a half now. It
19 was during our remodel, which I do believe was in 2002,
20 maybe 2003, that summer.
21     Q. Before then, before that time, did you think
22 that you should have gotten a merit raise and did not get
23 one?
24     A. Yeah. But again, no matter how often I said it

Johnson                              v.                    Wal-Mart Stores, Inc.
Cassandra Johnson         C.A. # 04-1450 JJF               May 24, 2005

Page 70

1    or asked for it, it was just discounted as I was just
2    talking, I suppose.
3        Q.  Well, but was that, are you saying, before you
4    were in the tire department?
5        A.  No, I never -- I never asked for a merit raise
6    before I moved to the tire center, no.
7        Q.  So now is it your contention that the reason you
8    did not get the merit raise is because you are a female?
9        A.  I really don't want to say that that would be
10   the only reason. I really don't know why I didn't get
11   one.
12       Q.  So do you know who did get them?
13       A.  I know that Nate got one. We had a part-timer
14   in our department, his name is Josh, and he transferred
15   out of our department. He worked full time for another
16   company and I guess he wanted to quit that company and he
17   offered to come to Sam's Club, but for more money and
18   they gave it to him and gave him a full-time spot in
19   another department.
20       Q.  So did he have previous experience?
21       A.  He worked in the tire center. I don't know what
22   else he did outside of that.
23       Q.  Now, do you know why they gave him a merit
24   raise?

Page 71

1        A.  I don't know.
2        Q.  Because you have not seen their evaluations?
3        A.  No. I've not seen anybody's evaluation.
4        Q.  Do you know what the requirements are for
5    obtaining a merit raise?
6        A.  No.
7        Q.  Do you know how many people got them?
8        A.  No, I don't.
9        Q.  So do you know whether any females received
10   merit raises?
11       A.  In the time that I've been there, I only think
12   of -- I can only think of one person that's female that
13   would have gotten one and I believe she left our club
14   last year. I can see her face. I can't remember her
15   name. I can't remember her name. But there has been an
16   instance I know of that at least one female got a merit
17   raise.
18       Q.  And there may be more?
19       A.  I don't know of any more. That's the only one
20   that I would know of.
21       Q.  Would you know all the people that got merit
22   raises?
23       A.  No, of course not.
24       Q.  Now, is it your contention that the people that

Page 72

1    received merit raises do the exact same job duties as you
2    do?
3        A.  No.
4        Q.  Okay.
5        A.  No.
6        Q.  Can I turn your attention to paragraph 17 of the
7    complaint? In paragraph 17 you said despite being paid
8    less that your male coworkers, you are expected to
9    perform the same job duties as your male coworkers, but
10   they are not expected to perform the same job duties as
11   you.
12           Exactly what are you referring to there?
13       A.  Basically that I'm trained to do their job but
14   they're just not trained to do mine.
15       Q.  Now, do you do their job?
16       A.  I do their job on occasion.
17       Q.  On occasion?
18       A.  Yes.
19       Q.  Do they ever help you out?
20       A.  Answering the phone, yeah; taking orders, no.
21       Q.  When you say "orders," you mean tire orders?
22       A.  Whether it be a special order for tires or
23   ringing a sale, no.
24       Q.  Now, can you explain to me a little bit about

Page 73

1    how the tire department is set up? I know you said it
2    used to be separated one way and now it's separated
3    another.
4        A.  All our merchandise used to be on the floor with
5    everything else, all the other general merchandise. Now
6    our tires are all in our area, our tire center now.
7        Q.  Okay.
8        A.  If you come in, if you don't know what you need,
9    I go to your vehicle, I see exactly what you need, I come
10   back in. If I have it, I show you what we have. I pull
11   the tires. I'll ring your sale. I take your merchandise
12   to the tire center for the guys to mount.
13       Q.  Okay.
14       A.  If it's something that I don't have and you
15   desperately need a special order tire, I order the tire.
16   I ring the sale. And when my merchandise arrives, I give
17   you a call, you come back in, I do your work order, and I
18   pull the tires for the guys to mount.
19       Q.  So would you say most of your interaction is
20   with the customer?
21       A.  Yes, most of my interaction is with the
22   customer.
23       Q.  When you go back into the -- I guess you go back
24   to the car.

19 (Pages 70 to 73)

Wilcox & Fetzer, Ltd.        Professional Court Reporters        (302)655-0477

| Johnson | | Wal-Mart Stores, Inc. |
|---|---|---|
| Cassandra Johnson | v.<br>C.A. # 04-1450 JJF | May 24, 2005 |

Page 74

1  A. Yes.
2  Q. Interacting with the tire technicians at all?
3  A. It depends. It depends on whether -- if you
4  come in and it's something that you already purchased and
5  a tire looks damaged, if it's something that I'm not
6  certain with, if I need to, I may ask one of the guys to
7  give me their judgment on it. If it matches my judgment,
8  then I may prorate tires out for you or I may just give
9  you a whole new set of tires, however it works out.
10  Q. But they're mainly out by the cars?
11  A. Yes.
12  Q. Would you say you're mainly in the store?
13  A. Mainly in the store and outside, you know, doing
14  the walk around the vehicles.
15  Q. Now, have you ever expressed a desire to become
16  a full-time tire technician?
17  A. No.
18  Q. So you've never applied for that position?
19  A. No.
20  Q. Have you ever been a team leader?
21  A. No, not in the tire center, no.
22  Q. Have you ever applied to become a team leader?
23  A. No.
24  Q. Have you ever had any supervisory

Page 75

1  responsibilities while you've been in the tire center?
2  A. When the supervisor isn't there, yes. I mean,
3  if they need help with the schedules being written, I
4  write the schedules. When inventory comes around, like I
5  said, Mr. Revis, when he first moved to our department,
6  he had no idea how inventory was taken. I helped our
7  club person that handles our inventory do our inventory
8  for our department.
9  Q. Okay.
10  A. Every week there is a portion of the report that
11  prints from our home office where we have merchandise
12  which is called our no movement. He had no idea what to
13  do with that. I did his no movement for him.
14  Q. Okay.
15  A. I mean, the things -- his duties that he didn't
16  understand, I took care of those duties.
17  Q. Was there anything else?
18  A. Not that I can recall right offhand.
19  Q. Now, Mr. Revis, where would he generally be at
20  the store, in the club?
21  A. As team leader he was supposed to be in my area,
22  my direct area, my work area helping me. Sometimes he
23  would be in that area. Sometimes he would be in the tire
24  center depending how our schedule was written that week.

Page 76

1  Q. So he wasn't always around you?
2  A. No.
3  Q. Was he back with the tire technicians?
4  A. Sometimes, and sometimes he would be in the --
5  in the sales floor with me.
6  Q. How often would you say you interacted with
7  Mr. Revis on a typical day?
8  A. I avoided Mr. Revis as often as I possibly
9  could. Anything other than talking tires, that was
10  basically it for me.
11  Q. I'd like to turn your attention to paragraph 18
12  of the complaint.
13  You said that after complaining regarding
14  your disparate treatment you suffered retaliation and
15  harassment by Mr. Revis and by other male supervisors and
16  coworkers; is that correct?
17  A. The coworkers part, no; the supervisor, yes,
18  because I was complaining to Mr. Stone about my work
19  schedule being I'm a single parent and my mother, we all
20  live there with my mother, but she's unable to drive. I
21  mean, basically I'm her caregiver.
22  And I was telling Mr. Stone, you know --
23  our store hours had changed. We were opening up at seven
24  in the morning. They were scheduling me to be to work by

Page 77

1  seven. And then when I told him I couldn't be there,
2  I'm, like, I can't come to work at 7:00. My son's
3  preschool program doesn't even open until 7:30. Okay.
4  8:00. I can't be here by 8:00. It's impossible for me
5  to drop him off at 7:30, come to Dover, drop my second
6  son off at day-care, and make it here by that time.
7  And his response to me was, "Well, we're in
8  business for Sam's Club and not Cassandra." So on it
9  went. So, of course, I accumulated attendance
10  infractions by being late.
11  Q. So they didn't try to accommodate you at all?
12  A. No.
13  Q. You're saying that that's because you complained
14  of disparate treatment?
15  A. I believe -- I believe it was because I
16  complained.
17  Q. Complained about what?
18  A. About Mr. -- about Mr. Revis and the way he was
19  treating me in that department. And I know that
20  Mr. Stone also had knowledge that I had filed a complaint
21  against Sam's Club.
22  Q. So are you saying that there was no harassment
23  or retaliation before the complaint?
24  A. No. I really -- I really don't think so.

20 (Pages 74 to 77)

Wilcox & Fetzer, Ltd.    Professional Court Reporters    (302)655-0477

Page 78

1  Q. So no one harassed you before you filed a
2  complaint?
3  A. No.
4  Q. Why did you file the complaint with the EEOC?
5  A. I filed the complaint because I couldn't get a
6  pay increase.
7  Q. So did --
8  A. The problem with Mr. Revis came after the fact.
9  And then they still wouldn't do anything about it.
10 Q. To whom did you complain?
11 A. About the pay increases? With Mr. Stone and
12 with Cornell.
13 Q. Did you ever complain to Mr. Revis?
14 A. No. He wasn't even there when I was asking for
15 a pay increase. He didn't come until probably September
16 or October.
17 Q. So did he know that you were complaining about
18 your pay?
19 A. I really don't know what he knew.
20 Q. Now, you claim that you suffered retaliation.
21 Who do you believe retaliated against you?
22 A. When I first complained about Mr. Revis making
23 the comments he was, basically every little thing I did,
24 it wasn't good enough.

Page 79

1  And if I went on break and he thought I was
2  taking too long, he would -- he would get on the intercom
3  and start yelling my name across the store. He would
4  call a member of management and told him to check my
5  time, whereas like I explained to a member of management
6  one day, you know, while he's doing that, I have a badge
7  on that has my name and "Sam's Club" and it's pretty much
8  impossible to walk through the club and not get stopped
9  by somebody and say, you know, Miss, can you help me find
10 such and such, or can you do this for me. He evidently
11 didn't understand that. So it became one thing after
12 another.
13     I went to management and I said, "Can you
14 please make him stop doing that? I'm not off task. I'm
15 doing what I'm supposed to be doing." And after that, I
16 mean, still nothing was done about it.
17 Q. How is it that you claim that he retaliated
18 against you? What was the retaliation?
19 A. By complaining to management about my work
20 performance whereas nobody had a problem with my work
21 performance before. I hadn't had any coachings on, you
22 know, Cassandra, you're not doing this or, Cassandra,
23 you're not doing that until he came on. I never was
24 coached about my work performance, but he just always had

Page 80

1  a complaint about me.
2  Q. Now, do you know whether Mr. Revis knew that you
3  filed an EEOC charge?
4  A. I really don't know.
5  Q. You don't know. Okay.
6      Is there anyone else that you claim
7  retaliated against you?
8  A. Well, I hate to say Jeremy would know, but he
9  knew about my complaint to the EEOC and he still wouldn't
10 help me with my work schedules. It's not like I was
11 asking for anything that I had before we changed our work
12 store hours. I worked nine to five before. It shouldn't
13 have been a problem with me going back to working nine to
14 five once the store hours changed. They didn't have to
15 change my schedule at all. They could have left it the
16 way it was.
17     But again, like he said, he was in business
18 for Sam's Club, not for me, whereas he could have at
19 least tried to come to some type of medium and he just
20 wouldn't.
21 Q. Now, did you have scheduling problems before you
22 filed the complaint?
23 A. I only had problems with my schedule when my
24 mother was sick. That was about it.

Page 81

1  Q. When was that?
2  A. Probably from September of 2002 till maybe -- I
3  want January or February of 2003.
4  Q. Did you need to discuss your schedule with
5  Mr. Stone at that time?
6  A. No.
7  Q. Okay.
8  A. No.
9  Q. So your schedule, there was no problems with
10 your schedule at that time?
11 A. No, no.
12 Q. You just had to --
13 A. I just had days I missed because she was in the
14 hospital and I was trying to transition her from being in
15 the hospital to a nursing home for rehabilitation.
16 Q. So is it your contention that you were having
17 problems with your schedule because you filed the
18 complaint with the EEOC?
19 A. Yes.
20 Q. Why? What's the basis for that?
21 A. Because it wouldn't have been, you know, unheard
22 of that they made, you know, made it so I could have came
23 in a little later or just changed my schedule completely.
24 I mean, it shouldn't have been a problem, but they made

21 (Pages 78 to 81)

| Johnson | v. | Wal-Mart Stores, Inc. |
|---|---|---|
| Cassandra Johnson | C.A. # 04-1450 JJF | May 24, 2005 |

Page 82

1  it into a problem.
2  Q. Who is "they"?
3  A. Basically management. I mean, they would
4  control even if Mr. Revis said no, if once I went to
5  management, they could have changed the schedule if they
6  had wanted to.
7  Q. Did they ever say anything to you about filing a
8  complaint with the EEOC?
9  A. No, no.
10 Q. How do you know they knew about it?
11 A. Because I had an older team leader,
12 Mr. McReynolds, come to me and say, "Cassandra, I heard
13 you lost your lawsuit." And I'm looking at him thinking,
14 I don't have any lawsuit. And this is before I even got
15 a right-to-sue letter. So somebody at Sam's Club knew.
16 Q. But did he tell you who knew?
17 A. No.
18 Q. Did anybody else talk to you about it?
19 A. No.
20 Q. Are there any other people you claim retaliated
21 against you?
22 A. No, not that I know of.
23 Q. Any other retaliation that you claim that you
24 suffered --

Page 83

1  A. No.
2  Q. -- that we haven't covered?
3     What is the harassment that you claim that
4  you suffered?
5  A. From Mr. Revis.
6  Q. Okay.
7  A. It's harassment having to go to work every day
8  and being forced to work in an uncomfortable environment,
9  and he made it uncomfortable for me every day with those
10 jokes and the way he treated me.
11 Q. So you claim the jokes were every day?
12 A. Every day.
13 Q. What were the jokes?
14 A. It was always about me being big. Always.
15 Q. Anybody else?
16 A. Like I said, I really don't know what he said
17 because I tried to avoid him at every cost. If it wasn't
18 something that I had to deal with him directly with, it's
19 not like I went into a room and started a conversation
20 with him.
21 Q. Are you claiming that the jokes came because you
22 filed a complaint with the EEOC?
23 A. That's not what I'm saying. I never told him
24 that I filed a claim. As far as I knew, he didn't know

Page 84

1  that I filed a claim.
2  Q. So why do you think he began harassing you?
3  A. It was just in his personality to do it. I
4  mean, when he came in, he came in being obnoxious from
5  the day he started.
6  Q. He started when? I'm sorry.
7  A. I want to say at the end of September, but
8  I'm -- I'm not certain whether it was the end of
9  September, maybe October of -- probably 2003. I'm not
10 certain.
11 Q. You said there's no one else that retaliated
12 against you or harassed you other than Mr. Stone or
13 Mr. Revis; is that right?
14 A. Yes.
15 Q. Do you know whether either of them were ever
16 disciplined for their actions?
17 A. I really don't know.
18 Q. Do you know whether they were coached?
19 A. I don't know.
20 Q. How often would you interact with Mr. Stone?
21 A. I see him in the club, say "Good morning," I go
22 to my work area. Or if he needed something, he would
23 call me on my desk phone and say, Cassandra, I need you
24 to do this, or can you take care of this, or can you ask

Page 85

1  one of the guys to do this. Other than that, that was
2  our basic interaction.
3  Q. Now, do you contend that Mr. Stone ever harassed
4  you?
5  A. Not directly, no, other than -- other than that
6  scheduling stuff, that's about it.
7  Q. Now, did you ever complain about the
8  retaliation?
9  A. No.
10 Q. Did you ever complain about the harassment?
11 A. As far as Mr. Revis, yeah, I did.
12 Q. To whom did you complain?
13 A. To Lakeria, Neosha, Jeremy, and Cornell. Of
14 course, one time when I called to the home office, the
15 call was fielded back to him.
16 Q. Now, would you be told what would happen with
17 those kinds of things?
18 A. No.
19 Q. So Mr. Revis may have been disciplined?
20 A. I really don't know whether he was or not.
21 Q. Now, is Mr. Revis still in your department?
22 A. No. He's working overnight as far as I know in
23 another department.
24 Q. When did that occur?

22 (Pages 82 to 85)

Page 86

1  A. Maybe March.
2  Q. Do you know why?
3  A. No, I don't.
4  Q. Paragraph 19 of your complaint, you allege that
5  you continued to suffer harassment on the basis of your
6  sex as well as in retaliation for complaints regarding
7  sex discrimination.
8        Is there anything other than what we've
9  already covered?
10  A. No, I guess not.
11  Q. So who is it exactly at Wal-Mart that you
12  believe discriminated against you?
13  A. I believe it was both my immediate supervisors,
14  both Jeremy and Johnny.
15  Q. They are the people that you contend retaliated
16  or harassed you?
17  A. No, nobody that I worked directly with, no.
18  Q. They didn't retaliate against you?
19  A. I'm sorry?
20  Q. Retaliate against you.
21  A. Say the question one more time.
22  Q. Who are the people that you believe retaliated
23  against you? I believe you said it was those same two
24  people?

Page 87

1  A. Those same two.
2  Q. The harassment you claim is only Mr. Revis?
3  A. Yes.
4  Q. Was there any other discrimination, harassment,
5  or retaliation other than what we've already covered?
6  A. No. I mean, the last instance that I remember
7  was probably in February when one morning we were
8  stocking tires and I -- the guy that was stocking,
9  Johnny, was sitting on a bench tying his shoe up and I
10  was changing signs on our batteries. And he pulled out a
11  piece of paper out of his back pocket with a full-figured
12  woman provocatively posed, and on it it had a little
13  bubble that said, "This is what happens to your ass when
14  you eat lard." But that was about the last instance.
15  Q. That was in February?
16  A. I believe February or March.
17  Q. Did he ever do anything like that before?
18  A. No. It was just mostly just the jokes.
19  Q. Do you like your job?
20  A. I love my job.
21  Q. Do you like the people you work with?
22  A. Most of the time, other than the times when we
23  have problems with our schedule where we are shorthanded,
24  those are probably about the most stressful times we have

Page 88

1  in that department. That's it.
2  Q. What damages do you believe you suffered as a
3  result of this litigation?
4  A. It's basically been mentally taxing having to go
5  to work and work in that environment every single day and
6  just be uncertain of what's next to come.
7        I mean, some days I would have to sit in
8  the car and say a silent prayer just before I could get
9  out of the car because I knew that those days were the
10  days I had to work with him and I just didn't know what
11  was coming at me next.
12  Q. What kind of symptoms? Have you had any
13  symptoms?
14  A. I mean, other than being depressed some days
15  and, like I said, my hair was falling out for a short
16  time. I mean, other than that, no. I mean...
17  Q. Did you ever see any doctors for that?
18  A. For my hair falling out? No.
19  Q. Or for the emotional --
20  A. For the depression, no, no.
21  Q. Any medication?
22  A. No.
23  Q. Do you contend that you are still being paid
24  unequally to your male coworkers?

Page 89

1  A. I don't want to say yes because most of the guys
2  that are in my shop now are all new. It's not even one
3  guy out there other than Greg Scott that has been there
4  for a while. The rest are all new, so I would probably
5  make way more money than they do.
6  Q. Since when do you believe that that stopped?
7  A. Probably -- probably when the last of them, the
8  older crew left, which would have been Kevin Rash and
9  Robert McKinsey.
10  Q. When was that?
11  A. They've probably been gone both for maybe a
12  year. Eight months to a year, probably.
13  Q. Is it your contention that the harassment
14  stopped, as well?
15  A. Now that Mr. Revis is gone, yes.
16  Q. Do you have anything else in your life that
17  causes you stress?
18  A. Not really. I deal with same daily issues
19  everyone else does. I've got two kids and the stress of
20  getting them to school and picking them up and my
21  mother's health issues, but that's no more than anyone
22  else has to deal with.
23  Q. You said for a little while your hair was
24  falling out. Do you recall when that was?

23 (Pages 86 to 89)