# EXHIBIT F



1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CASSANDRA JOHNSON,             )
    Plaintiff,              )
                               )
    v.                         ) C.A. No.
                               ) 04-1450 (JJF)
WAL-MART STORES, INC.,         )
a Delaware corporation,        )
    Defendant.              )

        Deposition of **JEREMY STONE**, taken
before Cheryl A. Anthony, Court Reporter, in the law
offices of Schmittinger & Rodriguez, 414 South State
Street, Dover, Delaware, on Wednesday, June 22, 2005,
beginning at 10:40 a.m.

APPEARANCES:

    SCHMITTINGER & RODRIGUEZ, PA
    BY:  NOEL E. PRIMOS, ESQUIRE
    414 South State Street
    Dover, Delaware   19901
    Attorney for Plaintiffs.

    BALLARD, SPAHR, ANDERS & INGERSOLL, LLP
    BY:  FARRAH I. GOLD, ESQUIRE
    919 North Market Street
    17th Floor
    Wilmington, Delaware   19801
    Attorney for Defendant.

**ORIGINAL RETAINED BY NOEL E. PRIMOS, ESQUIRE**

---

ANTHONY REPORTING
PO Box 234
Dover, Delaware   19903
(302)674-8884

1     A.     Tire technician.

2     Q.     Do you remember what he was making at the
3  time?

4     A.     No, I don't.

5     Q.     Who made the decision to promote Mr. Revis
6  to team leader?

7     A.     That would have been myself.

8     Q.     Did anyone else have input into the
9  decision?

10    A.     The store manager would.

11    Q.     Who was that?

12    A.     Cornell Randolph.

13    Q.     Is he still at the Dover Sam's Club?

14    A.     Yes, he is.

15    Q.     But was it ultimately your decision, and
16 Mr. Randolph just had input into it?

17    A.     Yes.

18    Q.     Is that a fair description?

19    A.     Yes, yes.

20    Q.     Did you interview any other people for the
21 team leader position other than Mr. Revis?

22    A.     I believe there's two or three others that
23 put in for it.  I don't remember the names.  It has been
24 so long ago.

1    Q.    Were they also in the tire department at the
2    time? The other people that put in for it?
3    A.    I don't remember.
4    Q.    Did Ms. Johnson put in for it?
5    A.    No.
6    Q.    Do you remember when Mr. Revis was promoted?
7    A.    I believe he started around July or August
8    of '03, and it was probably about -- I'm going to say 60
9    to 90 days after he was hired.
10   Q.    So maybe November?
11   A.    Probably about that time, yes.
12   Q.    November of '03, maybe?
13   A.    Yes, uh-huh.
14   Q.    And what did you base your decision to
15   promote Mr. Revis on?
16   A.    It was his skills, his overall leadership
17   ability that I saw in him before he was promoted. The
18   team prior to him was struggling. Johnny was kind of
19   picking up after him. Basically, it took a large
20   leadership role out in the shop without having the
21   official title. He did have prior experience as manager
22   in that particular area.
23   Q.    At the time did you determine what his
24   performance was in that previous position at Sears?

1   A.   Can you repeat the question? I'm sorry.

2   Q.   At the time of considering Mr. Revis for
3 this position, did you determine what his performance
4 had been in the previous position at Sears?

5   A.   No, I didn't.

6   Q.   You didn't make a call to Sears to find out?

7   A.   We did when we hired him initially. We did
8 a background check, and we called Sears. I spoke to his
9 supervisor initially, and they didn't want to lose him.
10 They didn't want him to leave there, basically for the
11 same reasons, because of his abilities, hard worker,
12 great worker.

13   Q.   So you had some pretty high expectations of
14 Mr. Revis when you put him into this team leader
15 position, correct?

16   A.   Yes.

17   Q.   Given your high expectations, can you
18 explain why he apparently didn't live up to those
19 expectations?

20        MS. GOLD: Objection as to form.

21        THE WITNESS: I don't understand the
22 question.

23 BY MR. PRIMOS:

24   Q.   Okay. Let me ask you this. Did Mr. Revis

1   Q.   Did he ever indicate to you that he felt
2   like he was having to work too hard because of a
3   manpower shortage?
4   A.   Yes.  He did say that.
5   Q.   Do you ever recall Ms. Johnson ever coming
6   to you and complaining about her pay rate?
7   A.   On two occasions, I do remember.
8   Q.   And when were those occasions?
9   A.   I don't remember exact dates.  I'm going to
10  say it was probably late summer 2003.  I believe that is
11  the time I came up with.  She came to me and expressed
12  that she needed a merit raise.  What I told her is I
13  would get back to her on the situation.
14  Q.   Did you get back with her?
15  A.   Yes.
16  Q.   And what happened?
17  A.   Okay.  I told her two things.  Number one,
18  she wasn't qualified due to it was too close to her
19  evaluation.  It had to be -- It's either six months
20  after or three months before is the only time you are
21  actually allowed to get a merit raise.  The system won't
22  allow you to punch one at any other time.  The second
23  thing I told her was she had to work on her attendance
24  and her sense of urgency.

1    position.  So the prior team leader, which would have
2    been Robert McClinsey, would have given Johnny most of
3    the information on that evaluation, since Johnny was new
4    to the position, new to the area.
5         Q.    Do you ever remember any issues coming up
6    about Ms. Johnson having a problem with getting to work
7    on time due to her mother being an invalid and her child
8    needing child care?
9         A.    Yes.
10        Q.    First of all, what was the problem?
11        A.    Basically, I believe she was scheduled to
12   come in at seven.  Johnny scheduled her to come in at
13   7:00.  She said that she can't come in at this time due
14   to child issues, having to take her son to school.  And
15   her mom really isn't capable of taking care of her
16   child.
17              So Johnny and her worked out a point to
18   where she could come in at eight.  Still, that wasn't
19   working for her.  She was still coming in late.
20              So she came to me and said:  I can't get
21   here at eight.  I said:  That is fine.  Come to work
22   here from nine to five.
23        Q.    When did Mr. Revis make the change in
24   schedule?

32

```
 1      A.      When the tire shop changed the hours, the
 2  tire shop changed its hours.  It used to open when the
 3  store opened at 10:00, back to 7:00.  And I'm going to
 4  say that was probably around October, November of last
 5  year.
 6      Q.      October or November of '04?
 7      A.      Yeah, I believe so.
 8      Q.      When Ms. Johnson came to you about this
 9  problem with this schedule, do you remember having or
10  making some comment to her along the lines of:  Well,
11  the schedule is not for Cassandra.  It's for Sam's?  Or
12  the schedule is not for Cassandra --
13      A.      No, no.
14      Q.      You didn't say anything like that?
15      A.      No.
16      Q.      Okay.  Did you have to instruct Mr. Revis to
17  accommodate Ms. Johnson with her schedule?
18      A.      Yes, I did.
19      Q.      So prior to that time, he wasn't willing to
20  accommodate her schedule?
21      A.      Yes, he did.  He changed it to 8:00.  And
22  apparently, that wasn't working with her or him.  So
23  that's when she came to me and said:  I can't come in at
24  eight.  Can we do something about that?
```

1         And I said: What time works for you? She
2    said 9:00. That is what she used to work before. I
3    said: That is fine. I don't really need you before
4    that. I have two tire techs in here then anyway.
5         Q.    So you told Mr. Revis to accommodate her?
6         A.    Yes.
7         Q.    Now, did she come to you before Mr. Revis
8    changed her start time to eight?
9         A.    Not that I'm aware, not that I remember.
10        Q.    So that was something that was handled
11   between her and Mr. Revis?
12        A.    Yes.
13              MR. PRIMOS: No further questions.
14              MS. GOLD: I have no questions. Again, we
15   would like to read and sign.