## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

CASSANDRA JOHNSON             *
                             *
        Plaintiff,            *        CIVIL ACTION
                             *        NO. 04-1450 (JJF)
v.                            *
                             *
WAL-MART STORES, INC.,        *
                             *
        Defendant.           *

---

**APPENDIX TO PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

SCHMITTINGER AND RODRIGUEZ, P.A
BY:  WILLIAM D. FLETCHER, JR.
     Bar I.D. #362
BY:  NOEL E. PRIMOS, ESQUIRE
     Bar I.D. #3124
     414 South State Street
     P.O. Box 497
     Dover, Delaware 19903-0497
     (302) 674-0140
     Attorneys for Plaintiff

Dated: 11/30/05

## TABLE OF CONTENTS

PAGE

DEPOSITION OF CASSANDRA JOHNSON, DATED MAY 24, 2005..... B1

AFFIDAVIT OF CASSANDRA JOHNSON,
    DATED NOVEMBER 23, 2005........................... B27

DECLARATION OF CORNELL RANDOLPH ....................... B30

DEPOSITION OF JOHNNY REVIS, DATED JUNE 22, 2005
    (Excerpts)....................................... B38

EMPLOYMENT RECORDS OF KEVIN RASH...................... B46

DELAWARE DEPARTMENT OF LABOR COMPLAINT FILED
    BY CASSANDRA JOHNSON............................. B49

JOURNAL OF CASSANDRA JOHNSON.......................... B52



**WILCOX & FETZER LTD.**

In the Matter Of:

# Johnson

## v.

# Wal-Mart Stores, Inc.

### C.A. # 04-1450 JJF

---

Transcript of:

# Cassandra Johnson

May 24, 2005

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

B1

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CASSANDRA JOHNSON,                )
                                  )
                Plaintiff,        )
                                  )    Civil Action
        v.                        )    No. 04-1450 JJF
                                  )
WAL-MART STORES, INC., a          )
Delaware corporation,             )
                                  )
                Defendant.        )

        Deposition of CASSANDRA JOHNSON taken
pursuant to notice at the law offices of Ballard Spahr
Andrews & Ingersoll, LLP, 919 Market Street, 12th Floor,
Wilmington, Delaware, beginning at 10:10 a.m. on Tuesday,
May 24, 2005, before Kathleen White Palmer, Registered
Merit Reporter and Notary Public.

APPEARANCES:

        NOEL E. PRIMOS, ESQUIRE
        SCHMITTINGER & RODRIGUEZ, P.A.
          414 South State Street
          Dover, Delaware  19901
          for the Plaintiff
        FARRAH I. GOLD, ESQUIRE
        BALLARD SPAHR ANDREWS & INGERSOLL, LLP
          1735 Market Street - 51st Floor
          Philadelphia, Pennsylvania  19103-7599
          for the Defendant

------------------------------------------------------

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477

Johnson                                        v.                    Wal-Mart Stores, Inc.
Cassandra Johnson                      C.A. # 04-1450 JJF                      May 24, 2005

Page 2

1          CASSANDRA JOHNSON,
2      the witness herein, having first been
3      duly sworn on oath, was examined and
4      testified as follows:
5  BY MS. GOLD:
6      Q.   Good morning, Ms. Johnson.
7      **A.  Good morning.**
8      Q.   My name is Farrah Gold and I represent Wal-Mart,
9  I guess more specifically Sam's Club, in connection with
10  the lawsuit that you've brought against the company.
11          Today I'm going to be taking your
12  deposition.  I'm going to ask you a series of questions
13  in connection with the claims that you've brought against
14  the company.
15          Have you ever had your deposition taken
16  before?
17      **A.  No.**
18      Q.   Then let's go through some ground rules.
19          The court reporter here is going to be
20  taking down everything you say and she can't take down if
21  we both speak at the same time.  So what I ask is that
22  you wait until I finish asking a question before you
23  answer and I'll give you the same courtesy.  Okay?
24      **A.  Okay.**

Page 3

1      Q.   Also for the same reason she can't take down
2  nods of the head or hand gestures or anything like that.
3  So I ask that all of your answers be verbal.
4          Can you do that for me?
5      **A.  I'll try.**
6      Q.   And probably speak up a little bit.
7      **A.  All right.**
8      Q.   If at any time you don't understand my
9  questions, just let me know and I'll try and rephrase
10  them for you so that you do understand.
11      **A.  Okay.**
12      Q.   If you answer the question, I'm going to assume
13  that you understood it, so make sure you ask me if you
14  don't.  Okay?
15      **A.  Okay.**
16      Q.   If at any time you need a break, this isn't an
17  endurance test or anything like that, so just let me
18  know.  The only thing I ask is that you answer the last
19  question that was pending, if there is one pending, and
20  then you can go take a break.
21      **A.  Okay.**
22      Q.   Is there any reason why you can't testify
23  truthfully today?
24      **A.  No.**

Page 4

1      Q.   Are you on any medication of any kind today?
2      **A.  Nothing that would impair my judgment, no.**
3      Q.   Are you currently under a doctor's supervision?
4      **A.  Yes.**
5      Q.   For what?
6      **A.  I had a gastric lap band on May 5th.**
7      Q.   You're taking medication for that?
8      **A.  Just a blood thinner.  I'm not taking any pain**
9  **medicine.  I have two kids to run around after.**
10      Q.   I'm sure that's a lot of work.
11          Can you please state your name for the
12  record?
13      **A.  Cassandra Johnson.**
14      Q.   Where do you live?
15      **A.  Smyrna, 120 Locust Street, Smyrna.**
16      Q.   Your Social Security number is --
17      **A.  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.**
18      Q.   When were you born?
19      **A.  6/12/72.**
20      Q.   Where were you born?
21      **A.  Dover, Delaware.**
22      Q.   Are you married?
23      **A.  No.**
24      Q.   You said you had children?

Page 5

1      **A.  Yes.**
2      Q.   How many?
3      **A.  Two.**
4      Q.   How old are they?
5      **A.  Five and three.**
6      Q.   They live with you?
7      **A.  Yes.**
8      Q.   Do you have any other dependents at all?
9      **A.  Technically I'm a caregiver for my mother.**
10      Q.   She's living with you, as well?
11      **A.  Yes.**
12      Q.   How old is she?
13      **A.  She will be 58 this June.**
14      Q.   Have you ever been charged with a crime?
15      **A.  No.**
16      Q.   So you never served time for anything?
17      **A.  No.**
18      Q.   Have you ever filed any other lawsuits?
19      **A.  No.**
20      Q.   Where did you go to high school?
21      **A.  Smyrna High School.**
22      Q.   Did you graduate?
23      **A.  Yes.**
24      Q.   When did you graduate?

2 (Pages 2 to 5)

B3

Johnson                                                    Wal-Mart Stores, Inc.
Cassandra Johnson              C.A. # 04-1450 JJF                May 24, 2005

Page 6

1    A.  1991.
2    Q.  Did you go to college?
3    A.  For two years.
4    Q.  Where did you go?
5    A.  Delaware State.
6    Q.  Did you earn a degree there?
7    A.  No.
8    Q.  What did you study?
9    A.  Accounting and business.
10   Q.  Great.  Did you like it?
11   A.  I did.
12   Q.  You did, I guess, no postgraduate work after
13   that?
14   A.  No.
15   Q.  Where did you work prior to Sam's Club?
16   A.  I worked as a temp, I believe.
17   Q.  Was that your first job before Sam's Club?
18   A.  No.
19   Q.  What was your first job, I guess, out of
20   college, if you can recall?  And if you can't, give me
21   the first thing you remember.
22   A.  I really don't remember.  I really don't
23   remember my first job out of college.
24   Q.  Okay.

Page 7

1    A.  Because I was working like two or three jobs
2    when I was going to college, so --
3    Q.  What were you doing while you were in college?
4    A.  I was a student worker.  I worked at Sears
5    and -- I believe I was working at a temp service for
6    Playtex.
7    Q.  What were you doing at Sears?
8    A.  I did credit solicitation for Discover.
9    Q.  So making phone calls?
10   A.  Actually, it was one on one.  It was in the
11   store.
12   Q.  What kind of job duties did you have associated
13   with that?
14   A.  That was it.  That was my main responsibility
15   then.
16   Q.  Okay.
17   A.  I don't think I did anything else other than
18   that.
19   Q.  You said you worked for a temp service for
20   Playtex.  What kind of job duties did you have there?
21   A.  When I worked for Playtex, I believe all I did
22   was pack bras and panties.
23   Q.  How long did you do those things?
24   A.  Probably about maybe a year.

Page 8

1    Q.  Then what did you do after college?
2    A.  I was unemployed probably about a year and a
3    half, maybe two years.
4    Q.  Were you doing anything in that time?
5    A.  Yes.  I believe that was around the time my mom
6    had her first heart attack.
7    Q.  Then you started working again?
8    A.  Yes.
9    Q.  Okay.
10   A.  I started working -- I did residential aid for
11   Kent Crest.  It was assisted living for mentally
12   retarded.
13   Q.  What did you do there?
14   A.  I worked the overnight shift, mainly helped with
15   baths, meds and eating, helping them get ready for Easter
16   Seals.
17   Q.  Why did you leave each of those jobs, going back
18   to Sears, I guess, and then --
19   A.  Sears, it was basically seasonal.
20   Q.  Okay.
21   A.  Same with the others except for Kent Crest.  I
22   left Kent Crest because they were accusing me of some
23   things that I didn't do, so --
24   Q.  What were they accusing you of?

Page 9

1    A.  Of client abuse.  And at the time there was
2    another girl indicated and she was the one who was doing
3    it.
4    Q.  That's a shame.
5        What did you do after Kent Crest?
6    A.  (No response.)
7    Q.  How long were you at Kent Crest?
8    A.  Probably about -- probably about a year, I
9    guess.
10   Q.  Okay.
11   A.  Maybe a little longer.  I'm really not sure.
12   Q.  Approximate is fine.
13   A.  Probably after that I was out of work for about
14   a year, and in that year I think I worked at the temp
15   service again.  I think I did work at the temp service
16   again.  And that was mostly Playtex because that's what
17   was there at the time.  And after that that's when I
18   started Sam's Club.
19   Q.  When did you start at Sam's?  Do you remember?
20   A.  September of '96.
21   Q.  Going back to your previous experience, did you
22   ever work before as a cashier before Sam's?
23   A.  Fast food when I was in high school.
24   Q.  Ever with tires at all?

3 (Pages 6 to 9)

B4

Johnson
Cassandra Johnson

v.

C.A. # 04-1450 JJF

Wal-Mart Stores, Inc.
May 24, 2005

Page 10

1    A.    No.
2    Q.    Did you ever experience any sex discrimination
3    or harassment in your previous jobs?
4    A.    No.
5    Q.    So did you ever complain about discrimination or
6    harassment in your previous jobs?
7    A.    No.
8    Q.    Did you ever experience any retaliation in those
9    previous jobs?
10   A.    No.
11   Q.    Were you ever disciplined or warned in any way
12   at those jobs?
13   A.    No.
14   Q.    I guess you said at Kent Crest, though,
15   eventually you had been terminated because you were
16   accused of something; is that correct?
17   A.    Yes.
18   Q.    Were you disciplined for that or --
19   A.    No.
20   Q.    So now starting with Sam's Club, you said you
21   started at Sam's in September of 1996; is that correct?
22   A.    Yes.
23   Q.    What was your position at that time?
24   A.    I was a cashier.

Page 11

1    Q.    Where in the store?
2    A.    In the front as a regular cashier, regular
3    checkout.
4    Q.    Who was your supervisor at that time?
5    A.    (No response.)
6    Q.    I know we are reaching back some time now. If
7    you recall.
8    A.    I want to say -- I want to say Michelle Jones.
9    Q.    What were your job duties as a front end
10   cashier?
11   A.    It was whatever was required. If I cashiered,
12   at night when I closed. If the cart guy needed help, I
13   helped the cart guy. If we needed to go out on the floor
14   and straighten clothes or sweep the floor -- whatever
15   needed to be done, that's what we did.
16   Q.    You say "we." Who else?
17   A.    As a group of cashiers. Nobody of the people I
18   started with are still there.
19   Q.    Did you get along with those people that you
20   worked with?
21   A.    Yes, most of the time.
22   Q.    What would you say you spent the majority of
23   your time doing as a front end cashier?
24   A.    Cashiering.

Page 12

1    Q.    So most of it was up at the cashier itself?
2    A.    Yes, it was.
3    Q.    Did you all perform the same job duties as the
4    other cashiers? Would you all perform the same duties?
5    A.    Mostly, yes.
6    Q.    Would you work the same hours?
7    A.    No, no. It varied from seven in the morning
8    till three, or ten to six, nine to five, whatever was
9    needed, and closing.
10   Q.    Would you work any of those shifts?
11   A.    Yes.
12   Q.    Or did you have any regular type of shift?
13   A.    No. At the time I didn't have any kids, so it
14   was -- I had open availability.
15   Q.    Would you socialize with your coworkers, would
16   you say? Joke around with them at all?
17   A.    At work, yes. After work, no.
18   Q.    Did you ever change positions while you were at
19   Wal-Mart, Sam's Club?
20   A.    I trained as a service runner. I did refunds.
21   And then I went back to cashiering.
22   Q.    Now, you said you were trained as a service
23   runner. What exactly is that?
24   A.    Supervisor of the cashiers.

Page 13

1    Q.    Did you ever act as a supervisor of the
2    cashiers?
3    A.    Yes.
4    Q.    For how long did you do that?
5    A.    Probably a month or two before I went to refunds
6    and exchanges.
7    Q.    Why did you stop serving as --
8    A.    Because there was another girl that was training
9    with me and they thought her better suited for it, so
10   they gave it to her and I just moved to refunds.
11   Q.    Was that a supervisory position, as well, in
12   refunds?
13   A.    No.
14   Q.    So what were you doing in refunds?
15   A.    At the time it was a stock area for, I believe,
16   some electronic stuff. So, you know, some of the
17   high-theft merchandise that was in the cages, we would
18   unlock and pass out or -- that was it. Refunds.
19   Q.    Who did you supervise as a service runner?
20   A.    Just cashiers.
21   Q.    Are any of those people still there?
22   A.    No.
23   Q.    Did you get along with those people? Any
24   problems?

4 (Pages 10 to 13)

B5

Johnson        v.        Wal-Mart Stores, Inc.
Cassandra Johnson      C.A. # 04-1450 JJF      May 24, 2005

Page 14

1    A.  I got along with everyone.
2    Q.  Then in refunds, how about there?  Do you still
3  work with any of those same people?
4    A.  No.
5    Q.  Are they still there at the store, anyone?
6    A.  Nobody that worked in refunds when I worked
7  then, but when I transferred, before I moved to the tire
8  center, there was still a couple ladies there that were
9  there when I worked refunds.
10    Q.  When did you stop doing that job in refunds?
11    A.  I probably stayed for about three or four months
12  before I went back over as a cashier.
13    Q.  Then when you went back as a cashier, were you
14  back in the front end --
15    A.  Yes.
16    Q.  -- or were you somewhere else?
17    A.  Technically it was all still the front end.  I
18  mean --
19    Q.  So performing the same job duties that you had
20  previously done?
21    A.  Yes.
22    Q.  Were there new people up there or was it the
23  same people?
24    A.  We have such a high turnover rate for cashiers.

Page 15

1  I mean --
2    Q.  Right.  Okay.  Performing the same job duties?
3    A.  Yes.
4    Q.  Then did you ever switch from that position in
5  the front end?
6    A.  I did.  I went to refunds again, only it was
7  probably for about two years then.  I probably did
8  refunds maybe about two years straight through.
9    Q.  Again, the same job duties as you had been
10  previously doing?
11    A.  Yes.
12    Q.  Were there new people back there?
13    A.  Yes, yes.
14    Q.  Do you remember any of the names of the people
15  you had worked with?
16    A.  That was a man named Preston.  Actually, he was
17  training me because he was -- he was transferring out to
18  another club.  There's a lady named Charita that's still
19  there.  There was a lady named Debbie.  Who else was
20  there?  A lot of people come and go.
21    Q.  Yes, I do know in that environment --
22    A.  It's hard to keep track of names.
23    Q.  Sure.
24    A.  Names and faces are such a blur.

Page 16

1    Q.  Who was your supervisor in that position?
2    A.  Her name was Dawn Harter.  And then after her I
3  believe it was another young lady named Rhonda Daum.  And
4  Tom Trasser was my area manager.
5    Q.  Was that both times you were in refunds, were
6  they the same?
7    A.  Dawn, I think so.  And Rhonda, the last portion
8  it was Dawn and Rhonda.
9    Q.  Did you get along with all of them?
10    A.  No.
11    Q.  No?
12    A.  No.  I mean, coworker wise, yes.  Personality
13  wise, no.  I mean, we probably all have people that we
14  can work with and wouldn't have a relationship outside of
15  work with.
16    Q.  Right.
17    A.  Two of the three would be that.  I mean, Rhonda
18  was fine, but Tom and Dawn, no.
19    Q.  What were the problems?
20    A.  I really don't know because it's not like I
21  wasn't doing my job, but I guess our personalities just
22  clashed.
23    Q.  Did you switch positions again at Wal-Mart?
24    A.  Yes.  I -- after I left refunds the last time,

Page 17

1  that's when I moved to tires.
2    Q.  That's where you are right now?
3    A.  Yes.
4    Q.  What are you doing in the tire department?
5    A.  My title was tire center cashier.
6    Q.  You said it was.  Is it still a tire center
7  cashier?
8    A.  I believe so.  I believe that's how I'm keyed
9  into our payroll scale.
10    Q.  Do you know approximately when you started in
11  the tire center?
12    A.  I want to say maybe in the late spring of 2000.
13  I want to say because I know it was -- probably maybe the
14  late spring of 2001.
15    Q.  Okay.
16    A.  It was not long after my son's first birthday,
17  so --
18    Q.  Okay.
19    A.  But during that time when I was at refunds we do
20  what they call cross-training.  So if someone was out in
21  the tire center, I would go over and work their desk for
22  them.
23    Q.  When did you do that cross-training?
24    A.  Whenever somebody didn't show up for work or

Wilcox & Fetzer, Ltd.      Professional Court Reporters      (302)655-0477

B6

Johnson                              v.                    Wal-Mart Stores, Inc.
Cassandra Johnson              C.A. # 04-1450 JJF                May 24, 2005

Page 18

1  they were short, I would go over and cross-trained.
2     Q.  What are your job responsibilities as a tire
3  cashier?
4     A.  As a tire center cashier, I ring tires. I do --
5     Q.  Did you say "ring"?
6     A.  Yes. I'm sorry. I ring tires. I do special
7  orders on tires. And I'm supposed to have general
8  knowledge of the merchandise I sell.
9     Q.  So you sell the merchandise?
10    A.  Yes.
11    Q.  Do you work on cars?
12    A.  I'm trained to. I have.
13    Q.  You have?
14    A.  I have.
15    Q.  How long would you say you spend each day doing
16 which duties?
17    A.  I don't do the physical work on the car every
18 day.
19    Q.  Okay.
20    A.  It's been times when we have everybody call out
21 except for myself, the cashier, and one guy in the tire
22 center or it's the end of a shift and there's one guy in
23 the tire center and myself, and then I will go out and
24 help. If he looks like he's backed up or -- it's

Page 19

1  supposed to be two people in the tire shop at all times,
2  and it's rarely ever that way.
3     Q.  So how often do you have to go back there, would
4  you say, in a week, let's just say? Is it every week?
5     A.  Fully staffed, maybe two or three times, maybe,
6  because someone is on a break or something and there's
7  one other guy in the shop. Before we were fully staffed,
8  often. At least three or four times a week just doing my
9  regular duties and running back and forth to make sure
10 the guy in the shop was still safe.
11    Q.  Would he be doing the physical labor at that
12 point?
13    A.  It depends. If he's got a car and there's a
14 tire on the rim that needs to be mounted, I can do that.
15    Q.  You said you trained to become a tire
16 technician. When did you do that?
17    A.  On the days that they were short staffed and I
18 went over to help out.
19    Q.  Okay.
20    A.  But before I could even move to that area, it
21 was a case of my manager at the time telling me I
22 couldn't transfer out of his department till he filled my
23 spot. And then it was when I moved to that area, if I
24 wanted to stay in that area, I would have to certify in

Page 20

1  that area. So the team leader at the time gave me a
2  notebook and told me to read it, and then I had to take a
3  test after I read the notebook.
4     Q.  Just back up for one second.
5        You said your supervisor wouldn't let you
6  out of the area. Do you mean in refunds?
7     A.  Refunds, yes.
8     Q.  So were you talking about Tom then?
9     A.  No. By that time it was George Bailey.
10    Q.  Did you get along with Mr. Bailey.
11    A.  I suppose.
12    Q.  So for a while you were kind of in between?
13    A.  Yes.
14    Q.  Then you came into the tire department, you
15 said, you think the spring of 2001?
16    A.  Probably so.
17    Q.  Is that when you came in formally? You mean
18 that's when you made the move?
19    A.  That's when I made the move.
20    Q.  Once you made the move into the tire department,
21 when is it that you started training to become a tire
22 technician?
23    A.  Immediately. I mean, like I said, he gave me
24 the notebook. I needed to know how to do what I do.

Page 21

1     Q.  Okay.
2     A.  The notebook wasn't on just how to ring a tire
3  up. I knew how to do that. It was the tire area itself.
4     Q.  You said "I." Who were you talking about?
5     A.  Ron McReynolds.
6     Q.  Was he your supervisor when you first came?
7     A.  At the time, yes. He was my team leader.
8     Q.  Can you explain to me a little about what a team
9  leader is?
10    A.  I guess Wal-Mart's chain of command is general
11 manager, manager, and then team leader. So my team
12 leader is the person that's, you know, directly
13 accessible to me every day in my area.
14    Q.  Then who is below a team leader?
15    A.  The workers.
16    Q.  So you?
17    A.  Yes.
18    Q.  Did you get along with Mr. McReynolds, did you
19 say?
20    A.  Yes.
21    Q.  So you started training. Then did you need some
22 type of special certification to be a tire technician?
23    A.  That was what the notebook was for, to certify
24 me in mounting tires.

6 (Pages 18 to 21)

Johnson                                                         Wal-Mart Stores, Inc.
Cassandra Johnson                    C.A. # 04-1450 JJF                    May 24, 2005

Page 22

1    Q.  When did you get that certification?
2    A.  Probably the same spring I started working in
3  that department.
4    Q.  You think it was in 2001?
5    A.  Yes.
6    Q.  Are you sure that's when it was?
7    A.  It was whenever I started because I remember he
8  gave me the black notebook and I had to take the test.
9    Q.  There was a test?
10   A.  Yes.  At the end of the notebook he gave me a
11  little test, told me to fill it out, and I gave it back
12  to him.
13   Q.  Who else was back there?
14   A.  Very high turnover rate.
15       I believe when I moved to that department
16  there was a guy named Jeff, Nate, Dave Moffitt.
17   Q.  Is Moffitt someone else or is it Dave Moffitt?
18   A.  It's Dave Moffitt.
19   Q.  Okay.
20   A.  A guy named Kevin Rash.  It's been so long
21  because most of those guys are gone except for Nate and
22  Kevin.  Michael Hunt was there.  Oh, my God.  We got a
23  lot of guys come and go.  I can't remember all of them.
24   Q.  Were they tire cashiers or tire technicians?

Page 23

1    A.  No.  Just tire technicians.
2    Q.  These are all tire technicians?
3    A.  Yes, except for Mike Hunt.  Mike Hunt used to be
4  a cashier, also.
5    Q.  So if you're formally a tire technician, are you
6  performing different job duties than if you are a tire
7  cashier?
8    A.  I assume so because they're not required to ring
9  a tire.  They don't even have -- what they have, like
10  passwords to sign on to the register.  So if you are not
11  keyed in to do it, you don't do it.
12   Q.  But they spend most of their time working on the
13  cars?
14   A.  Yes.
15   Q.  Would you say you got along with the people that
16  you worked with?
17   A.  I got along with everybody back there.
18   Q.  Joke around with them at all?
19   A.  Not really because at the time they were
20  separated from me.  There was an enclosed area for myself
21  and then they were out into the shop.
22   Q.  Now, was your supervisor the same the whole time
23  you were back in the tire department or has it been the
24  same?

Page 24

1    A.  No.  Probably -- it probably changed in 2000 --
2  probably about 2001, 2002, maybe.  It went from
3  Mr. McReynolds to another guy named Dave, and then after
4  Dave a guy names Robert McKlinsey.
5    Q.  These were the team leaders that you were
6  talking about?
7    A.  Yes, yes.
8    Q.  Did you get along with Dave?
9    A.  All of them.
10   Q.  Was there anyone after Robert McKlinsey?
11   A.  The last guy was Mr. Revis.
12   Q.  Did you get along with Mr. Revis?
13   A.  No.
14   Q.  No?  What was the problem with Mr. Revis?
15   A.  When Mr. Revis came in, he transferred in just
16  as a regular tire tech from Sears.  And when he came in,
17  he came straight in with jokes all day long, every day.
18  Just obnoxious, all day long, every day.
19   Q.  Now, was he in your area?  You said he was a
20  tire technician?
21   A.  Yes.
22   Q.  So was he back working in the cars?
23   A.  By the time he came in, we already had a remodel
24  and my area was only separated by a window.  But when I

Page 25

1  was ringing tires before, the member would go out on the
2  floor, bring the tire to the tire center.  Now I pull the
3  tires, I take them out to the tire techs.
4    Q.  How often is that?
5    A.  Every day.  Whenever I make a sale.
6    Q.  How often would you say you make a sale?
7    A.  It's a lot considering this year we got high
8  sales, so -- for the region, so it's a lot.
9    Q.  "A lot" is kind of general.  If you could be a
10  little bit more specific.
11       Would you say you go back there five times
12  a day?  Ten times a day?  Is it less than that?  More
13  than that?
14   A.  It would be more than that.
15   Q.  More than --
16   A.  I'm more than sure I ring more than -- more than
17  ten sales a day.
18   Q.  When is it that you say Mr. Revis came in?
19   A.  Probably in maybe the end of last September.
20   Q.  Last September, 2004 or 2003?
21   A.  2003.
22   Q.  You said he would make jokes.  What kind of
23  jokes?
24   A.  At first -- they weren't even aimed at me when

7 (Pages 22 to 25)

B8

Johnson
Cassandra Johnson

v.

C.A. # 04-1450 JJF

Wal-Mart Stores, Inc.
May 24, 2005

Page 26

1  he first came in.  It was just really -- he was just
2  really obnoxious and just told jokes all day.  But I
3  guess after a while when he noticed I wasn't laughing at
4  the jokes, then it became -- they started being aimed
5  towards me.
6      Q.  What kind of things would he say?
7      A.  A joke about me being a bear -- or I'll tell you
8  exactly what it was.  One day I had been outside and I
9  was sweating because it was hot and my back was itching.
10 So I didn't ask any of the guys to scratch my back, so
11 there's a pole behind my register and I was rubbing my
12 back against the pole.  He said, "That's what bears do."
13 So, I mean, after a while it started being little snide,
14 gentle comments to being directly aimed at me.
15     Q.  Okay.
16     A.  And they were demeaning in a way that before he
17 came I didn't have to worry about my coworkers laughing
18 behind me back.  If they did, they did it discreetly.  At
19 least I didn't have to hear it.
20     Q.  You said he would make jokes to everyone,
21 though.  Did he make jokes to other people, as well?
22     A.  As far as I know, he told jokes to them.  I
23 don't know what they were about because most of the time,
24 just simply because I didn't care for the way he carried

Page 27

1  himself, I didn't hang around.  I would just generally
2  walk away unless there was something that I had to deal
3  directly with him about.
4      Q.  Would Mr. Revis ever say anything about you
5  being a female to you?
6      A.  No.
7      Q.  When you first started at Sam's Club, did you
8  receive an associate handbook?
9      A.  Yes.
10     Q.  If you could just take a look at this.  I know
11 they are usually pretty and colorful.  If you could tell
12 me if this is generally what it looked like.
13     A.  Yes, it does.
14     Q.  Did you have to sign an acknowledgment when you
15 got that handbook?
16     A.  I believe so.  Each book had an acknowledgment
17 in the back of it.
18     Q.  Does that look like what you saw?
19     A.  Yes.
20     MS. GOLD:  I would like to mark this as
21 Exhibit 1, please.
22     (Johnson Exhibit 1 was marked for
23 identification.)
24

Page 28

1  BY MS. GOLD:
2      Q.  Miss Johnson, have you ever seen a job
3  description for a tire cashier?
4      A.  Yes.
5      Q.  Can you tell me if this is what you've seen?
6      A.  Yes, it is.
7      MS. GOLD:  Can you please mark this as 2?
8      (Johnson Exhibit 2 was marked for
9  identification.)
10 BY MS. GOLD:
11     Q.  Can you take a second to read that over and can
12 you tell me, do you think this accurately describes what
13 you do?
14     A.  Yes.
15     Q.  Have you ever seen a job description for a tire
16 technician?
17     A.  Yes.
18     (Johnson Exhibit 3 was marked for
19 identification.)
20 BY MS. GOLD:
21     Q.  Can you tell me if this is what you've seen?
22     A.  (The witness reviews the document.)  Yes.
23     Q.  Is this an accurate description of what tire
24 technicians do?

Page 29

1      A.  No.
2      Q.  This is not?
3      A.  No.
4      Q.  Can you tell me what it is that's not accurate?
5      A.  Just looking, sell merchandise.  None of those
6  guys sell merchandise.  Some of the guys they have there
7  are what they call rookies.  I mean, they know how to
8  mount a tire, but they're mounting whatever I put out
9  there.  If you went in and you needed a specialized tire
10 because you had a performance car or your car required a
11 certain tire, they don't -- some of those guys don't know
12 that.
13     Q.  Okay.
14     A.  I mean, when they come in, they don't send them
15 down and say, okay, this is a tire specifically designed
16 for this, this, and this.  They don't do that.  They
17 teach them how to mount a tire.  That's it.
18     Q.  So they're doing more of the physical labor?
19     A.  Yes.
20     Q.  Would you say you're doing less of the physical
21 labor; is that correct?
22     A.  Yes.
23     Q.  So would you say that the tire cashier
24 description is more accurately what you do or do you

8 (Pages 26 to 29)

B9

Johnson                                  v.              Wal-Mart Stores, Inc.
Cassandra Johnson            C.A. # 04-1450 JJF                May 24, 2005

Page 30

1    contend that you do these tire technician functions?
2      A.  Technically I do the tire technician, too.
3    Other than basically mount a tire, that's the only thing
4    I don't do.  I sell the tire.  I know the merchandise.  I
5    sell memberships and credit.  I do all the stocking.
6    Those guys, when they come out and stock in the morning
7    when we get tires in, if we don't have anybody to unload
8    the truck, I go back and count the tires that come off
9    the truck.  When they come to the tire center, I help
10   stock those tires.
11     Q.  Okay.
12     A.  Merchandise -- yes, I straighten tires.  I do
13   the signs for the tires.  Some of the guys in the shop
14   aren't required to do that.
15     Q.  Are there any things that they have to do that
16   you don't have to do?
17     A.  Be physically prepared every morning to put a
18   tire on a car.  That's it.
19     Q.  What is your understanding of how employees at
20   Sam's Club are paid?  When you come in and you get your
21   initial pay rate, what's your understanding of how that's
22   set?
23     A.  I'm sorry.
24     Q.  I apologize.  It might be a little confusing.

Page 31

1         When you come to Sam's Club and you apply
2    for a position and they tell you what you are going to be
3    making, what's your understanding of what that's based
4    upon?
5      A.  From my understanding, I always thought it was a
6    general scale that either the cashiers came in making a
7    general amount of money, the tire center came in making a
8    general amount of money, the meat department makes a
9    general amount of money.  I always figured that that's
10   how the scale went.
11     Q.  Do you know whether experience, previous
12   experience would ever play into that?
13     A.  I doubt very seriously if it would.
14     Q.  Do you know whether it does?
15     A.  Not for sure, no.
16     Q.  Now, how about pay raises?  Do you know what
17   kind of pay raises there are at Sam's Club?
18     A.  Generally the only pay raises we get are every
19   year when we get our eval.
20     Q.  So that's once a year.
21     A.  That's once a year.  And anything in between
22   would be -- I'm sorry.  Anything in between would be
23   considered a merit raise, and supposedly they aren't
24   given that often.  It's at the general manager's

Page 32

1    discretion.
2      Q.  Who is it that sets your rate of pay?
3      A.  I don't know.
4      Q.  Who is it that does your annual evaluations?
5      A.  Whoever my team leader is at the time.
6      Q.  So is it the team leader that will decide what
7    kind of raise you get?
8      A.  Basically.
9      Q.  Or is that the store manager?
10     A.  Basically it's the team leader because they sit
11   down and write your eval.  And of course after they write
12   it, a member of management has to sign it, so...
13     Q.  So a member of management does have to approve
14   it?
15     A.  Yes.
16     Q.  Any other kinds of pay raises?
17     A.  Not that I know of, no.
18     Q.  Would you ever discuss your pay with anyone?
19     A.  We are not supposed to.
20     Q.  There's a policy about that?
21     A.  As far as I know, there's a policy that we don't
22   discuss our pay scales.
23     Q.  So would anyone discuss their pay with you?
24     A.  No.

Page 33

1      Q.  I'm going to show you a document.  Take a minute
2    to read it over.
3         MS. GOLD:  We are on Exhibit 4.
4         (Johnson Exhibit 4 was marked for
5    identification.)
6    BY MS. GOLD:
7      Q.  Do you recognize this document?
8      A.  Yes, I do.
9      Q.  Can you tell me what it is?
10     A.  It is my complaint to the Department of Labor.
11     Q.  Did you review the allegations before you would
12   sign this?
13     A.  Yes.
14     Q.  Is that your signature at the bottom?
15     A.  Yes.
16     Q.  Let me show you another document.
17        (Johnson Exhibit 5 was marked for
18   identification.)
19   BY MS. GOLD:
20     Q.  Do you recognize this document?
21     A.  No, I don't.
22     Q.  This is not familiar to you?
23     A.  No.
24     Q.  Can you look at page 2 and then again on page 3,

9 (Pages 30 to 33)

B10

Johnson
Cassandra Johnson

v.

C.A. # 04-1450 JJF

Wal-Mart Stores, Inc.
May 24, 2005

Page 34

1  is that your signature?
2  **A.  Yes.**
3  Q.  So had you reviewed this before you had signed
4  this?
5  **A.  This looks familiar to me.  This doesn't look**
6  **familiar.**
7  Q.  Page 1 does not look familiar to you?
8  **A.  Yes.**
9  Q.  But page 2 does look familiar?
10  **A.  Yes.**
11  Q.  That's your signature at the bottom?
12  **A.  Yes.**
13  Q.  And page 3 looks familiar?
14  **A.  Yes.**
15  Q.  And that's your signature at the top?
16  **A.  Yes.**
17  Q.  This was an affidavit that you had signed when
18  you went to the EEOC?
19  **A.  Yes.**
20  Q.  The next thing I would like to show you is this
21  document.
22          (Johnson Exhibit 6 was marked for
23  identification.)
24

Page 35

1  BY MS. GOLD:
2  Q.  Do you recall that you had to do initial
3  disclosures in this case --
4  **A.  Yes.**
5  Q.  -- identifying people who you believed had
6  knowledge of your allegations?
7  **A.  Yes.**
8  Q.  What I'd like to do is run through the people
9  you've named.
10          The first person you say is Steven Bromley.
11  **A.  Yes.**
12  Q.  Can you tell me who Mr. Bromley is?
13  **A.  He is a team leader in marketing, which is**
14  **refunds.**
15  Q.  Had you worked with him when you were in
16  refunds?
17  **A.  Briefly.**
18  Q.  So what is it that you believe Mr. Bromley know
19  about this litigation, what information?
20  **A.  Excuse me.**
21  Q.  Take your time.
22  **A.  Mr. Bromley has been in conversations, included**
23  **in conversations about me and he would -- he would have a**
24  **general idea of why I wasn't receiving the fair pay.**

Page 36

1  Q.  You said "fair pay."
2  **A.  Well, my pay scale compared to -- and why when I**
3  **applied for other positions I wasn't even considered for**
4  **them.  I'm basically interviewed, but it's a formality.**
5  Q.  Why do you say that?
6  **A.  Because pretty much in our club, I hate to say**
7  **it, but it's true, if you're not one of those little**
8  **cliques, you don't even get considered.  You get the**
9  **interview because Wal-Mart says once you sign up for it,**
10  **you have to be interviewed.  But most of the time when**
11  **those positions are posted, they already have an idea of**
12  **who they want to be in that position.**
13  Q.  You said "little cliques."  I'm not sure what
14  you mean.
15  **A.  If you're not into the crowds that pal around**
16  **with management -- I'm just not.  I mean, I go in and I**
17  **do my job and that's all that's required of me.  I don't**
18  **want to be a manager's best friend or go out.  That's not**
19  **me.  So if you're not in with that, pretty much you**
20  **just -- you just there.**
21  Q.  Are there any females in those cliques?
22  **A.  Yes.**
23  Q.  Now, Cornell Randolf is another person you've
24  named as a person who would have knowledge.  Now, who is

Page 37

1  Mr. Randolf?
2  **A.  He's the club GM.  He's the general manager.  He**
3  **runs the store.**
4  Q.  What information do you believe he has?
5  **A.  He would, of course, have the reasons why, one,**
6  **I couldn't get an increase in pay because it's his**
7  **discretion, or why I wouldn't be able to get a merit**
8  **raise or -- it's his club.**
9  Q.  Did you get along with Mr. Randolf?  Do you get
10  along with Mr. Randolf?
11  **A.  I go to work and he's there.  "Good morning."  I**
12  **do my job.  I mean...**
13  Q.  Now, I guess first going back to Mr. Bromley,
14  has he ever given you any reasons why you haven't
15  received increases?  Has he ever said anything to you?
16  **A.  He sort of had knowledge like when Dawn and Tom**
17  **Trasser were my immediate supervisor, he overheard**
18  **conversations about them not caring for men even though at**
19  **the time basically I was pregnant and they were just**
20  **busting my butt.  I mean, I worked really long schedules.**
21  **I would close the desk like six or seven nights out of**
22  **the week and it didn't bother anybody that I couldn't get**
23  **a pay raise.  And when my eval came around, instead of**
24  **giving me a fair eval, they gave me the least amount they**

10 (Pages 34 to 37)

B11

Johnson                                                                          Wal-Mart Stores, Inc.
Cassandra Johnson                     C.A. # 04-1450 JJF                              May 24, 2005

Page 38

1  could.
2    Q.  You said they were busting your butt. What do
3  you mean?
4    A.  I mean, at the time I was pregnant and they were
5  scheduling me to work seven days straight.
6    Q.  Did anyone else have to work seven days
7  straight?
8    A.  No, no. You can -- you can go back and pull
9  those schedules from when I worked at refunds and you
10  will see that nobody at refunds worked those days or the
11  hours that I worked.
12    Q.  How many people worked there?
13    A.  During the daytime maybe it would be three or
14  four people scheduled if they came to work. Sometimes I
15  would be scheduled to work with someone and they would
16  call off, so I would work till whenever, until somebody
17  could come to the desk and help me.
18    Q.  Do you know what their schedules were?
19    A.  No.
20    Q.  Do you know why they didn't schedule them?
21    A.  I don't know. At the time it was because
22  supposedly I was the only one with open availability.
23  That's why I got scheduled the closings that I got.
24    Q.  Mr. Randolf, has he ever said anything to you

Page 39

1  about why you haven't gotten any raises?
2    A.  No. No. When I was asking before I went to the
3  EEOC, it was -- I had to wait and he would get with me
4  and take time out and talk to me. And that time just
5  never came around.
6    Q.  You said you complained. When did you first
7  complain about not being paid?
8    A.  It's been probably a year before I even filed
9  the complaint with the EEOC.
10    Q.  Who did you lodge that complaint with?
11    A.  My direct supervisor, which would have been
12  Jeremy Stone. I kept asking him and asking him and he
13  was going to go to Cornell. And so finally I went to
14  Cornell myself, and of course I'm still waiting.
15    Q.  You said Jeremy Stone was your direct
16  supervisor. When was he your direct supervisor?
17    A.  He's been the manager in the tire center
18  probably about three years, I believe.
19    Q.  Now, just help me put this all in context. You
20  said it was the store manager, a team leader, then you.
21  Where does Jeremy fit into that hierarchy?
22    A.  He would be the store manager -- he would be my
23  area manager. It's Cornell, Jeremy, my team leader.
24    Q.  So above your team leader is Jeremy?

Page 40

1    A.  He would be above my team leader. I'm sorry.
2    Q.  That's okay. Lots of people.
3        So now you said Jeremy -- so that's the
4  next person. So is that the knowledge you believe Jeremy
5  has, as well, the information would be what you just
6  said?
7    A.  Basically.
8    Q.  Was there any other information?
9    A.  Not that I can think of at the moment, no.
10    Q.  Did Jeremy ever tell you the reasons that you
11  were not receiving --
12    A.  No.
13    Q.  -- a raise?
14        Is Jeremy involved in your evaluation at
15  all?
16    A.  He signs it once it's written.
17    Q.  Does he have anything to do with evaluating you?
18    A.  I really don't think so.
19    Q.  Would you get along with Jeremy?
20    A.  Same as everybody else.
21    Q.  The next person you named is Deborah Kennedy.
22  What information do you believe she has?
23    A.  She's the club resource manager.
24    Q.  So what information do you believe she has?

Page 41

1    A.  I had been to her after Mr. Revis had made the
2  comments that he made to me and I had mentioned them to
3  her.
4    Q.  When was that?
5    A.  Probably at least -- at least back in February,
6  maybe March the last.
7    Q.  Last --
8    A.  When he made his last few comments to me. I'm
9  sorry.
10    Q.  That's okay.
11        You're saying he made the last comments to
12  you in February/March of this year, 2005?
13    A.  Yes. And before that when he made comments, she
14  sat in with myself and Jeremy Stone and Jeremy, basically
15  asked him to apologize and promise that he wouldn't do it
16  again. And it still continued.
17    Q.  Is there any other knowledge that you think
18  Miss Kennedy has?
19    A.  Other than sitting in on that little meeting and
20  the other comments that I told her about him making, she
21  knew about when I called our 1-800 Wal-Mart line and
22  complained about Mr. Revis when nothing was done, when I
23  made my first initial complaints to management. The call
24  was fielded back to Cornell and, in turn, you know, still

11 (Pages 38 to 41)

Johnson                                 v.                    Wal-Mart Stores, Inc.
Cassandra Johnson              C.A. # 04-1450 JJF                    May 24, 2005

Page 42

1  it went on.
2      Q.  You said when you first called the 800 line.
3  When was that?
4      A.  It's been a little over a year, I guess.
5      Q.  Now, going back just one minute, any of the
6  other people -- Mr. Bromley, Mr. Randolf, Mr. Stone and
7  now Miss Kennedy -- are you claiming that they ever were
8  there when Mr. Revis was joking with you?
9      A.  Not one-on-one to witness, but Deborah, Jeremy,
10  and Cornell all had firsthand knowledge of it and, in
11  fact, he admitted to doing it in front of Deborah and
12  Jeremy Stone.
13     Q.  But that's the firsthand knowledge you are
14  talking about?
15     A.  Yes.
16     Q.  Because you told them about it?
17     A.  Yes.
18     Q.  Okay.
19     A.  Then he admitted to it in front of those.
20     Q.  What is it that he admitted to doing?
21     A.  That he was making the comments and that he was
22  sorry, he didn't really think I was taking them
23  personally.
24     Q.  The comments you are talking about are him

Page 43

1  calling you a bear?
2      A.  The fat jokes.  It wasn't just that one bear
3  joke.  It was a lot of jokes.  And then making fun of me
4  to my coworkers.  And it's hard enough having, you know,
5  men respect you in an all-man field, but he was making
6  the situation worse with his jokes, and even doing it
7  behind my back to my coworkers.
8      Q.  How do you know he was doing it to your
9  coworkers?
10     A.  Because they were bringing it to my attention.
11     Q.  What did they tell you?
12     A.  On one instance there was a guy, Gary Johnson,
13  and Greg Scott who made some comments to and they came
14  to me.  I was like, you know, told him that, you know,
15  that that crap's not funny and he should stop.  He was
16  like, you probably really should complain.  I was like,
17  well, he said it to you, basically.  If you don't
18  complain and say this is -- if they don't do the
19  complaining, it just looks like I'm a girl in their
20  department complaining about my team leader.
21         So I knew it wasn't going to do any good
22  because I knew I was already making complaints about him
23  making the comments and nothing was being done.
24     Q.  Now, what jokes did they say he made?

Page 44

1      A.  I can't even remember, but I'm more than sure I
2  wrote it down and gave it to my attorney.  I'm sure I
3  did.  Because I was keeping a journal.  It was hard to
4  keep up with it because, like I said, it was constant and
5  they were malicious.
6      Q.  You said you were keeping a journal?
7      A.  I did.
8      Q.  All right.  We'll get to that.
9         So was there anyone else that you claim
10  would come to you and told you about jokes?
11     A.  Other than Gary and Greg, no.
12     Q.  The jokes, did they ever say it was because you
13  were a female?
14     A.  No.
15     Q.  Okay.
16     A.  No, because they were always fat jokes.
17     Q.  Would they say that he made jokes to other
18  people, as well?
19     A.  No.  If it didn't pertain to me, why would they
20  tell me?
21     Q.  The next person you named is Lakeria Bryant.
22     A.  Yes.
23     Q.  Who is she?
24     A.  She is the front end area manager.

Page 45

1      Q.  Was she your manager when you were in the front
2  end?
3      A.  At the time, no, she wasn't my direct manager,
4  but she's a manager in the club.  So if my manager isn't
5  available, she would be there.  She's a member of
6  management.
7      Q.  What information does she have about your
8  claims?
9      A.  She basically -- basically she witnessed him one
10  day insult me in front of a female customer and she, you
11  know, said, "Really, you shouldn't do that."  But when I
12  said, "Lakeria, look, this is ongoing.  Somebody needs to
13  say something to him about it."  And she said, "Okay.
14  I'll say something to Jeremy."  Nothing was said, so I
15  went to Jeremy myself.
16     Q.  What did Jeremy say to you?
17     A.  He said he would deal with it.  And I think
18  within the next couple of days he had Johnny and the
19  coaches all fix with myself and say basically the reason
20  for this meeting is because Cassandra feels picked on.
21  So right then when he said it, it made me feel like he
22  was trying to belittle me and make light of the
23  situation.
24     Q.  You thought Jeremy was trying to make light of

12 (Pages 42 to 45)

Johnson        v.        Wal-Mart Stores, Inc.
Cassandra Johnson      C.A. # 04-1450 JJF      May 24, 2005

Page 46

```
 1  that?
 2      A.  Yes.
 3      Q.  When was that?
 4      A.  I want to say probably -- probably October or
 5  November of last year.
 6      Q.  2004?
 7      A.  I believe so.
 8      Q.  Now, the next person you named is Sheila
 9  Forrest.
10      A.  Yes.
11      Q.  Who is Miss Forrest?
12      A.  She was at the time just a team leader in
13  another area.  And one afternoon when I went in to
14  complain about Mr. Revis to Jeremy, his answer to my
15  complaint was that, you know, "He jokes like that with
16  everybody.  He's not familiar with the Wal-Mart family."
17  You know, well, we have computer-based learning and
18  everybody takes the same CBLs and we all have a general
19  knowledge that there are jokes that you just don't tell
20  at the workplace.
21      Q.  Right.
22      A.  And again, he made light of the situation and
23  tried to below it off.  And she was in the office when he
24  said it and she said, you know, "His jokes aren't funny.
```

Page 47

```
 1  He aims jokes at other people and somebody needs to make
 2  him stop."
 3      Q.  Who said that?
 4      A.  Miss Forrest.
 5      Q.  Miss Forrest said that someone needs to make
 6  Mr. Revis stop?
 7      A.  Stop his jokes.  She was in the office. And at
 8  the time I believe Lakeria was in the office, also.
 9      Q.  Now, were they there when Mr. Revis was joking
10  with you?
11      A.  No.
12      Q.  Did Mr. Revis ever joke with them?
13      A.  He's kind of like in the little clique I said
14  with Cornell and Jeremy, so I'm more than sure he jokes
15  with them.
16      Q.  Do you know if he ever makes jokes about them?
17      A.  I really don't know.
18      Q.  The next person you named is Neosha Dixon; is
19  that correct?
20      A.  Yes.
21      Q.  Can you tell me who Miss Dixon is?
22      A.  Miss Dixon is also an area manager.
23      Q.  What area?
24      A.  I want to say she's like right under Cornell,
```

Page 48

```
 1  but I'm not sure.
 2      Q.  So that means the whole store or --
 3      A.  Yes.  Sort of kind of like when he's out, I
 4  think she runs our club, but I'm not certain.
 5      Q.  So was she like a comanager?
 6      A.  Yes.
 7      Q.  Okay.  I got you.  I'm learning the ropes, as
 8  well.
 9          So what knowledge do you believe Miss Dixon
10  has about you?
11      A.  I complained to her and she fielded my complaint
12  to Jeremy.  So it's not like when the stuff was happening
13  I was just letting it go by.  For a while I did, and then
14  after a while I just got sick of it because, like I said,
15  it became more and more frequent and they were always
16  directed at me.
17      Q.  Did Miss Dixon ever witness Mr. Revis --
18      A.  No.
19      Q.  Do you know whether Mr. Revis ever joked with
20  Miss Dixon?
21      A.  I don't know.
22      Q.  I think that's everyone that you've named in
23  your disclosures.
24          Was there anyone else you believed had
```

Page 49

```
 1  knowledge of your claims that you've not named in your
 2  initial disclosures?
 3      A.  I'm really not certain.  It's been a long while
 4  and it's hard to remember names at this point.
 5      Q.  Is there anyone that you claim was there when
 6  Mr. Revis was making jokes to you?
 7      A.  Other than my general coworkers, that's it.  I
 8  mean --
 9      Q.  And your general coworkers being --
10      A.  Greg and Gary and Nate and Kevin and Robert
11  McKlinsey.  I mean, they were all working in the area
12  with us at the same time, so even if he wasn't saying
13  them directly to me, I'm more than sure at the times when
14  I wasn't in earshot, he was saying them to them, too.
15      Q.  You haven't named them in your initial
16  disclosures.  Do you claim that they have knowledge of
17  your allegations?
18      A.  I believe so.
19      Q.  Do you know if any of these people know that you
20  filed a formal complaint with the EEOC?
21      A.  I wouldn't know.  I know that I haven't
22  discussed it with any of them.
23      Q.  Okay.
24      A.  But --
```

13 (Pages 46 to 49)

B14

Johnson                              v.                    Wal-Mart Stores, Inc.
Cassandra Johnson              C.A. # 04-1450 JJF                 May 24, 2005

Page 50

1     Q.  Okay.
2         MR. PRIMOS:  Do you think we might be able
3  to take a break?
4         MS. GOLD:  Absolutely.  Sure thing.
5         (A recess was taken at this time.)
6  BY MS. GOLD:
7     Q.  The next thing I would like to show you, do you
8  recall that we sent you interrogatories?
9     A.  Yes.
10        (Johnson Exhibit 7 was marked for
11  identification.)
12 BY MS. GOLD:
13    Q.  Were these the interrogatories you recall seeing
14 and these were your responses?
15    A.  Yes.
16    Q.  These are accurate to the best of your
17 knowledge?
18    A.  To the best of my knowledge, yes.
19    Q.  You've claimed that you've spoken with several
20 people regarding this litigation.  The four people you
21 mentioned are Steven Bromley, Jeremy Stone, Deborah
22 Kennedy and Lakeria Bryant.  Have we already covered what
23 you spoke with them about?
24    A.  I never told Steven that Johnny was saying this

Page 51

1  or that to me.  It wasn't any of his business because at
2  the time he wasn't my team leader and it was nothing he
3  could do about it, anyway.
4     Q.  So what is it that you discussed with
5  Mr. Bromley?
6     A.  Just about the issue with not being able to get
7  a pay increase and that I was, you know, really stressed
8  and I didn't know exactly why I couldn't get one.  And
9  that was basically about it.
10    Q.  Now, did Mr. Bromley have any control over
11 whether you would receive pay increases?
12    A.  No.
13    Q.  So were you going to him more as a friend or —
14    A.  Just as a friend.
15    Q.  Who else did you speak with about the pay issue?
16    A.  Only Jeremy and Cornell.
17    Q.  The next thing I would like to show you, you may
18 recall we sent you a request for documents.
19        (Johnson Exhibit 8 was marked for
20 identification.)
21 BY MS. GOLD:
22    Q.  Does this look familiar?
23    A.  (The witness reviews the document.)  It does.
24    Q.  Now, are these all the documents that you claim

Page 52

1  are responsive to this request?
2     A.  Yes.
3     Q.  You claim that you were saying earlier that you
4  kept a journal?
5     A.  Of some of the instances where Mr. Revis was
6  making complaints.  And I did give that to my attorney.
7     Q.  But you were keeping that independent of your
8  attorneys?
9     A.  Oh, yeah.  I mean, it wasn't like he said, you
10 know, you need to keep a journal or anything, no.
11    Q.  So do you think that that might be your
12 responses to some of these requests?
13    A.  I'm more than sure the pages that I gave him he
14 probably did turn in, so —
15    Q.  I have not seen your journal.
16    A.  Really?
17    Q.  I have not.  Would I be able to get a copy of
18 that?
19    A.  I didn't give him a whole journal.  It was
20 just —
21    Q.  I understand.  You're saying that there were
22 certain entries that related to your claims in this case?
23    A.  Oh, yeah.
24    Q.  Is that right?

Page 53

1     A.  Yes.
2     Q.  How would you keep this journal?  Was this
3  independent of this litigation?
4     A.  Yes.
5     Q.  Do you just keep a journal generally?
6     A.  Just generally write down thoughts or how I felt
7  at the time.
8     Q.  Related to this?
9     A.  No.  Just something I do every now and then when
10 I'm frustrated, so —
11    Q.  But there are entries that relate to this?
12    A.  Yes.
13    Q.  To your claims in this case?
14    A.  Yes.
15        MS. GOLD:  I would like to see that, if
16 possible.
17        MR. PRIMOS:  I'll look into that.
18        MS. GOLD:  Okay.  I guess I reserve the
19 right to question her about that at a later time if for
20 some reason it pertains.
21 BY MS. GOLD:
22    Q.  Are there any other documents that you have in
23 your possession that might be relevant?
24    A.  No.  Like you gave me the handbook, I'm more

14 (Pages 50 to 53)

Johnson            v.            Wal-Mart Stores, Inc.
Cassandra Johnson      C.A. # 04-1450 JJF      May 24, 2005

Page 54

1  than sure that some of the instances I claimed about
2  Mr. Revis, his basic discrimination against me and saying
3  the jokes he was saying as opposed to Wal-Mart has a no
4  tolerance policy for, so -- no. There's nothing else
5  that I have.
6     Q. About how many entries do you think you had in
7  your journal?
8     A. Up until probably ten to 15 because after a
9  while I basically tried to not focus on that anymore.
10    Q. Do you recall approximately when these entries
11 were made?
12    A. Mostly -- probably about a year ago.
13    Q. Okay.
14    A. And again, like I said, I was basically at this
15 point just trying not to focus. My hair was falling out.
16 I was stressful. I mean, I just -- it just started
17 taking over, so...
18    Q. What kind of things would you write in the
19 journal?
20    A. If I was really mad, most of the time I wrote
21 exactly what happened to me and that would be it.
22    Q. Which was --
23    A. What was said and who said what and how I felt
24 about it at the time.

Page 55

1     Q. You said what was said and who said what.
2        Was there anyone other than Mr. Revis that
3  made comments to you?
4     A. No.
5     Q. Okay.
6     A. No.
7     Q. What kind of things were said?
8     A. Just the general jokes and the treatment I was
9  getting from him and from Jeremy.
10    Q. That's what you've described earlier?
11    A. Yes.
12    Q. Any other jokes that stand out in your mind?
13    A. No, because all of them were hurtful. I mean --
14    Q. Were they all based on your weight? Is that
15 what you are saying?
16    A. Yes, yes.
17    Q. Okay.
18    A. Not -- it became -- it just got to the point
19 where it made me focus on me a lot more. I mean, I was
20 already going to work clean, in a clean uniform, and I
21 was dressed appropriately, but I still -- I still wasn't
22 good enough. You know?
23    Q. But is it your contention that you were the only
24 one that was being joked to?

Page 56

1     A. Yeah. There were no other fat women in the
2  department, so it couldn't have been aimed at anyone but
3  me.
4     Q. Were there any other fat men in the department?
5  I know "fat" is a very general term.
6     A. Not all of them were physically fit. In fact,
7  Mr. Revis is not poster board material.
8     Q. Would he ever make jokes about himself?
9     A. No.
10    Q. Would he ever make jokes about anyone else in
11 the department?
12    A. Yeah.
13    Q. Okay.
14    A. Yeah.
15    Q. On that, who else did you hear him make jokes
16 about?
17    A. I guess -- I guess just general jokes to some of
18 the guys out there whether somebody was moving too slow
19 or wasn't keeping up with everybody else. But it wasn't
20 a malicious I'm-trying-to-hurt-your-feelings type of
21 joke.
22    Q. You think Mr. Revis was intentionally trying to
23 hurt your feelings?
24    A. I believe Mr. Revis was intentionally trying to

Page 57

1  hurt my feelings. And basically I believe it was
2  Mr. Revis knew I knew more than him as far as some of the
3  Sam's Club things that we needed to do in our area, like
4  the inventory and stuff like that. And I basically think
5  he was just trying to belittle me because he felt small
6  himself.
7     Q. But you think that directly had to do with the
8  fact that you are a female?
9     A. Yes.
10    Q. Why is that?
11    A. In all the time that he was back there, I don't
12 ever remember anybody being upset over him saying, you
13 know, any type of joke to them.
14    Q. But does that mean that they weren't upset? Do
15 you know whether they were upset?
16    A. I never physically went out and asked anybody
17 "Were your feelings hurt?" because it didn't affect me.
18    Q. I'd like to show you your complaint in this
19 matter, if you can take a minute to look that over.
20       (Johnson Exhibit 9 was marked for
21 identification.)
22 BY MS. GOLD:
23    Q. Do you remember this?
24    A. (The witness reviews the document.) Yes.

15 (Pages 54 to 57)

Johnson                              v.                    Wal-Mart Stores, Inc.
Cassandra Johnson            C.A. # 04-1450 JJF                     May 24, 2005

Page 58

1    Q.  This is your complaint in this matter?
2    A.  Yes.
3    Q.  Is this accurate, to the best of your knowledge?
4    A.  To the best of my knowledge, yes.
5    Q.  If I can turn your attention to paragraphs 14
6    and 16 of the complaint, in paragraph 14 you say that
7    defendant has refused to pay you equally to your male
8    coworkers, even though you possess more seniority than
9    some of your male coworkers; is that correct?
10   A.  Yes.
11   Q.  In 16 you say that the male coworkers who are
12   paid more than you despite having less seniority and that
13   they include Mr. Revis as well as tire mounter Memphis
14   and tire mounter Nathan Gibson; is that correct?
15   A.  Yes.
16   Q.  Now, when is it that you contend you were not
17   being paid equally to your male coworkers?
18   A.  Well, Nate is no longer there and Mr. Revis is
19   no longer in my department, although I'm not sure if he's
20   still not keyed under our pay scale.  I don't know.
21   As far as Memphis goes, I'm not really
22   certain of whether he ever made anywhere near what myself
23   and Nate and Mr. Revis made.
24   But in any case, Mr. Revis is, like I said,

Page 59

1    a talker, so of course he came in from Sears, so he,
2    himself, said that he was getting paid more than he made
3    at Sears and, of course, he blurted what he made.
4    Q.  Now, let's go back for a second.
5    Before you were in the tire department, did
6    you believe that you were paid equally to your male
7    coworkers?
8    A.  I didn't have any male coworkers.
9    Q.  So you had all female coworkers before the tire
10   department?
11   A.  Yes, yes.
12   Q.  You came into the department, you're saying,
13   around the spring of 2001?
14   A.  Yes.
15   Q.  So is that the time frame that we are talking
16   about when you are saying these are the people that you
17   are comparing yourself to --
18   A.  Yes.
19   Q.  -- since then?  Okay.
20   What's the basis for your claim --
21   A.  Basically seniority has really nothing to do
22   with it because technically at Wal-Mart there is no such
23   thing as seniority.  I guess time on the job really
24   doesn't matter with them.

Page 60

1    But as far as, you know, if it did matter,
2    Mr. Revis was making more money than me and I had been
3    there longer than him and I was doing my job and his.
4    Other than him going out there and physically putting on
5    a tire, which after probably about two months he didn't
6    have to do, anyway, because he came in as a tire mounter
7    and then probably about a month or so later they made him
8    the team leader.
9    So they didn't even wait his full 90 days
10   before they, you know, gave him a promotion, which,
11   again, with the little Wal-Mart handbook think, gee, you
12   supposed to wait 90 days, but they didn't.  Oh, well.
13   Q.  Do you know why?
14   A.  No, I don't know why.
15   Q.  You agree that seniority is not the basis for
16   pay at Wal-Mart?
17   A.  No.  I know the seniority has nothing to do with
18   it.
19   Q.  Do you know what does have to do with it?
20   A.  I'm assuming it would be your work performance.
21   Q.  Do you know what Mr. Revis' work performance is
22   or was?
23   A.  At the time -- again, he hadn't even made it to
24   his 90 days.  They didn't know what he was capable of.

Page 61

1    They was going on based on the fact that he worked at
2    Sears and mounted tires there.
3    Q.  But he did have previous experience mounting
4    tires?
5    A.  Yes.
6    Q.  Do you know what other qualifications Mr. Revis
7    had before Wal-Mart?
8    A.  No.
9    Q.  Do you know what his previous job experience
10   was?
11   A.  No.
12   Q.  Do you know what his education was?
13   A.  No.
14   Q.  While he was in your department, is it your
15   contention that he was performing the same exact job
16   duties as you were?
17   A.  When he first came in, no.  He was just a tire
18   mounter.  Then like I said, maybe a month or two later
19   they made him a team leader.
20   Q.  Okay.
21   A.  And when he came in, no, he didn't know how to
22   do the team leader job, so it was my responsibility to
23   help him with it.
24   Q.  But he came in as a tire technician?

16 (Pages 58 to 61)

Johnson
Cassandra Johnson

v.

C.A. # 04-1450 JJF

Wal-Mart Stores, Inc.
May 24, 2005

Page 62

1    A.  Yes.
2    Q.  Not a tire cashier?
3    A.  No.
4    Q.  All of these people that you were talking about
5  were tire technicians; is that right?
6    A.  Yes.
7    Q.  Did you have the same schedule as Mr. Revis?
8    A.  No, I don't think so.  I kind of think when he
9  came in he was part-time, but I'm not certain.
10    Q.  So you don't know what his hours were?
11    A.  No.
12    Q.  Do you know whether Mr. Revis had any attendance
13  problems?
14    A.  How could he when he had only been there for two
15  months?
16    Q.  In his whole time.
17    A.  I really don't know.
18    Q.  Do you have any personal knowledge of the
19  reasons that Mr. Revis received?
20    A.  No, I don't.
21    Q.  Have you ever seen Mr. Revis' evaluations?
22    A.  No.
23    Q.  How about Memphis?  He was the next person you
24  claimed was earning more than you; is that correct?

Page 63

1    A.  I really don't think Memphis was earning more
2  than me.  I'm not certain.  I never asked him.  Like I
3  said, I didn't even ask Johnny or Nate what they were
4  making.  It was just -- it was just -- I had an idea that
5  they were making more money than me.
6    Q.  You had an idea based on --
7    A.  Nobody else in my department was complaining
8  about needing a pay raise other than me.  And then when
9  Nate finally did complain, he went to Cornell and asked
10  him for a merit raise and it was given.
11          So, you know, I'm thinking, well, if he can
12  get a merit raise, I'm, you know, working here in the
13  tire center and wherever else they need me to be and here
14  my performance should speak for itself.  So I went and
15  asked for one, too, and couldn't get one.
16    Q.  Now, do you know why other people might not have
17  complained about their raises?
18    A.  Maybe they were satisfied with what they were
19  making.
20    Q.  Now, do you know what Memphis' qualifications
21  were?
22    A.  No.  I think Memphis worked at Pep Boys before
23  he came to Sam's Club.
24    Q.  So he did have some previous experience in the

Page 64

1  tire department?
2    A.  Yes.
3    Q.  Do you know what his level of education was?
4    A.  No, I don't.
5    Q.  Have you ever seen Memphis' evaluations?
6    A.  No.
7    Q.  Is it your contention that Memphis was
8  performing at the same job duties as you were?
9    A.  No.
10    Q.  Did he have the same schedule as you did?
11    A.  I don't think so, no.
12    Q.  Do you know whether he worked more or less than
13  you did?
14    A.  I think Memphis was full time.  I think he
15  started off part-time and then within a couple months
16  they probably made him full time.
17    Q.  Are you full time?
18    A.  Yes.
19    Q.  So do you think you worked around the same
20  number of hours or --
21    A.  Probably.
22    Q.  Do you know whether Memphis had any attendance
23  problems?
24    A.  I don't know.

Page 65

1    Q.  Then the next person you had named was
2  Mr. Gibson; is that right?
3    A.  Yes.
4    Q.  Do you know how much Mr. Gibson was making?
5    A.  No, not right off, no, I don't.
6    Q.  Do you know what his previous experience was?
7    A.  I think before Nate started there he was
8  unemployed and before that he was in jail.
9    Q.  Do you know if he had any previous experience as
10  a tire technician?
11    A.  No.  Before that he was in jail for selling
12  drugs, so no.
13    Q.  But do you know whether he did before that?
14    A.  Nope.
15    Q.  Had you ever seen Mr. Gibson's evaluations?
16    A.  No.
17    Q.  Do you know whether any of these individuals
18  were disciplined, received any discipline?
19    A.  I don't know.
20    Q.  Do you know, was Mr. Gibson working the same
21  number of hours as you?
22    A.  He was full time, yes.
23    Q.  Did he have any attendance problems, do you
24  know?

17 (Pages 62 to 65)

Wilcox & Fetzer, Ltd.

Professional Court Reporters

(302)655-0477

B18

Johnson          v.         Wal-Mart Stores, Inc.
Cassandra Johnson     C.A. # 04-1450 JJF     May 24, 2005

Page 66

1 A. I don't know that, either.
2 Q. Is there anyone else that you were claiming you
3 believed worked, performed substantially equal work that
4 you were and was receiving more money?
5 A. I kind of think Kevin Rash was. He had been
6 there for a while. He quit for a while. Came back.
7 Quit again. Came back. Quit again. Came back again,
8 so --
9 Q. But do you know what his pay was?
10 A. I think each time he left and came back he came
11 at the same rate of pay he left at.
12 Q. But do you know what that was?
13 A. No, I don't.
14 Q. Do you have any idea what his qualifications
15 were?
16 A. No, I don't.
17 Q. Do you have any idea what his previous
18 experience was?
19 A. No.
20 Q. Level of education?
21 A. I think Kevin graduated from Delaware State and
22 I do believe he majored in criminal justice. I'm not
23 sure.
24 Q. How about, have you ever seen Kevin's

Page 67

1 evaluations?
2 A. No.
3 Q. Do you know whether he had any attendance
4 problems?
5 A. No, I don't know.
6 Q. Do you know what his schedule was like?
7 A. I believe when he came back the first time he
8 was part-time and then the following times he was full
9 time.
10 Q. Was he also working as a tire technician?
11 A. Yes.
12 Q. Is there anyone else that was working as a tire
13 cashier?
14 A. There was an older gentleman, Mr. Carroll,
15 Carroll Stone, but his pay would not be anywhere near
16 mine. He would definitely make more money than me
17 because he is a charter partner, so he's like been there
18 since the store opened.
19 Q. So he's been there a real long time?
20 A. A really, really long time.
21 Q. Does he have a lot of experience, would you say?
22 A. He's just a cashier. That's it.
23 Q. But a lot of experience as a cashier?
24 A. He still doesn't do the duties that I do.

Page 68

1 Mr. Carroll was not even held accountable for the
2 computer system that we are supposed to use. He does not
3 know how to use it unless they've trained him here in the
4 last month that I've been out. And he doesn't do any
5 special orders on tires.
6 Q. Are you contending that you should be making --
7 A. No, nowhere near what Mr. Carroll works because,
8 again, he was there since the store opened, but there's
9 supposed to be nothing, you know, close to seniority.
10 But he's been there when they had a different pay scale
11 and they rated pay differently.
12 Q. Have you ever seen Mr. Stone's evaluations?
13 A. No.
14 Q. Do you know what his qualifications are?
15 A. No, I don't.
16 Q. Anybody else that you're contending earned more
17 than you that shouldn't have?
18 A. No. I really don't know.
19 Q. Now, can you look at paragraph 20 of the
20 complaint? Does paragraph 20 talk about what we had just
21 discussed? Does that cover what we had just discussed?
22 A. I suppose, yeah.
23 Q. Is there anyone else that you are talking about
24 that worked substantially equal to you but was paid

Page 69

1 higher wage rates?
2 A. Other than Kevin, I would have him more so than
3 Memphis.
4 Q. I would now like to turn your attention to
5 paragraph 15 of the complaint. You claim that on the
6 basis of your sex, you have not been given a merit raise.
7 What's the basis for that claim?
8 A. Again, I kept asking, you know, my immediate
9 manager, which was Jeremy, you know, did he think I could
10 get a merit raise. And he said we would sit down and
11 discuss it and the time never came. And he would talk to
12 Cornell about it and that time never came. And when I
13 went to Cornell about it, it was I would have to wait and
14 he would sit down and talk to me. And again, the time
15 never came.
16 Q. Now, when was it that you asked, when you first
17 asked?
18 A. It's been well over a year and a half now. It
19 was during our remodel, which I do believe was in 2002,
20 maybe 2003, that summer.
21 Q. Before then, before that time, did you think
22 that you should have gotten a merit raise and did not get
23 one?
24 A. Yeah. But again, no matter how often I said it

18 (Pages 66 to 69)

Johnson                                    v.                    Wal-Mart Stores, Inc.
Cassandra Johnson              C.A. # 04-1450 JJF                       May 24, 2005

Page 70

1  or asked for it, it was just discounted as I was just
2  talking, I suppose.
3     Q.  Well, but was that, are you saying, before you
4  were in the tire department?
5     A.  No, I never -- I never asked for a merit raise
6  before I moved to the tire center, no.
7     Q.  So now is it your contention that the reason you
8  did not get the merit raise is because you are a female?
9     A.  I really don't want to say that that would be
10  the only reason.  I really don't know why I didn't get
11  one.
12     Q.  So do you know who did get them?
13     A.  I know that Nate got one.  We had a part-timer
14  in our department, his name is Josh, and he transferred
15  out of our department.  He worked full time for another
16  company and I guess he wanted to quit that company and he
17  offered to come to Sam's Club, but for more money and
18  they gave it to him and gave him a full-time spot in
19  another department.
20     Q.  So did he have previous experience?
21     A.  He worked in the tire center.  I don't know what
22  else he did outside of that.
23     Q.  Now, do you know why they gave him a merit
24  raise?

Page 71

1     A.  I don't know.
2     Q.  Because you have not seen their evaluations?
3     A.  No.  I've not seen anybody's evaluation.
4     Q.  Do you know what the requirements are for
5  obtaining a merit raise?
6     A.  No.
7     Q.  Do you know how many people got them?
8     A.  No, I don't.
9     Q.  So do you know whether any females received
10  merit raises?
11     A.  In the time that I've been there, I only think
12  of -- I can only think of one person that's female that
13  would have gotten one and I believe she left our club
14  last year.  I can see her face.  I can't remember her
15  name.  I can't remember her name.  But there has been an
16  instance I know of that at least one female got a merit
17  raise.
18     Q.  And there may be more?
19     A.  I don't know of any more.  That's the only one
20  that I would know of.
21     Q.  Would you know all the people that got merit
22  raises?
23     A.  No, of course not.
24     Q.  Now, is it your contention that the people that

Page 72

1  received merit raises do the exact same job duties as you
2  do?
3     A.  No.
4     Q.  Okay.
5     A.  No.
6     Q.  Can I turn your attention to paragraph 17 of the
7  complaint?  In paragraph 17 you said despite being paid
8  less that your male coworkers, you are expected to
9  perform the same job duties as your male coworkers, but
10  they are not expected to perform the same job duties as
11  you.
12         Exactly what are you referring to there?
13     A.  Basically that I'm trained to do their job but
14  they're just not trained to do mine.
15     Q.  Now, do you do their job?
16     A.  I do their job on occasion.
17     Q.  On occasion?
18     A.  Yes.
19     Q.  Do they ever help you out?
20     A.  Answering the phone, yeah; taking orders, no.
21     Q.  When you say "orders," you mean tire orders?
22     A.  Whether it be a special order for tires or
23  ringing a sale, no.
24     Q.  Now, can you explain to me a little bit about

Page 73

1  how the tire department is set up?  I know you said it
2  used to be separated one way and now it's separated
3  another.
4     A.  All our merchandise used to be on the floor with
5  everything else, all the other general merchandise.  Now
6  our tires are all in our area, our tire center now.
7     Q.  Okay.
8     A.  If you come in, if you don't know what you need,
9  I go to your vehicle, I see exactly what you need, I come
10  back in.  If I have it, I show you what we have.  I pull
11  the tires.  I'll ring your sale.  I take your merchandise
12  to the tire center for the guys to mount.
13     Q.  Okay.
14     A.  If it's something that I don't have and you
15  desperately need a special order tire, I order the tire.
16  I ring the sale.  And when my merchandise arrives, I give
17  you a call, you come back in, I do your work order, and I
18  pull the tires for the guys to mount.
19     Q.  So would you say most of your interaction is
20  with the customer?
21     A.  Yes, most of my interaction is with the
22  customer.
23     Q.  When you go back into the -- I guess you go back
24  to the car.

19 (Pages 70 to 73)

B20

Johnson                                    v.                    Wal-Mart Stores, Inc.
Cassandra Johnson              C.A. # 04-1450 JJF                        May 24, 2005

Page 74

1   A.   Yes.
2   Q.   Interacting with the tire technicians at all?
3   A.   It depends.  It depends on whether -- if you
4   come in and it's something that you already purchased and
5   a tire looks damaged, if it's something that I'm not
6   certain with, if I need to, I may ask one of the guys to
7   give me their judgment on it.  If it matches my judgment,
8   then I may prorate tires out for you or I may just give
9   you a whole new set of tires, however it works out.
10  Q.   But they're mainly out by the cars?
11  A.   Yes.
12  Q.   Would you say you're mainly in the store?
13  A.   Mainly in the store and outside, you know, doing
14  the walk around the vehicles.
15  Q.   Now, have you ever expressed a desire to become
16  a full-time tire technician?
17  A.   No.
18  Q.   So you've never applied for that position?
19  A.   No.
20  Q.   Have you ever been a team leader?
21  A.   No, not in the tire center, no.
22  Q.   Have you ever applied to become a team leader?
23  A.   No.
24  Q.   Have you ever had any supervisory

Page 75

1   responsibilities while you've been in the tire center?
2   A.   When the supervisor isn't there, yes.  I mean,
3   if they need help with the schedules being written, I
4   write the schedules.  When inventory comes around, like I
5   said, Mr. Revis, when he first moved to our department,
6   he had no idea how inventory was taken.  I helped our
7   club person that handles our inventory do our inventory
8   for our department.
9   Q.   Okay.
10  A.   Every week there is a portion of the report that
11  prints from our home office where we have merchandise
12  which is called our no movement.  He had no idea what to
13  do with that.  I did his no movement for him.
14  Q.   Okay.
15  A.   I mean, the things -- his duties that he didn't
16  understand, I took care of those duties.
17  Q.   Was there anything else?
18  A.   Not that I can recall right offhand.
19  Q.   Now, Mr. Revis, where would he generally be at
20  the store, in the club?
21  A.   As team leader he was supposed to be in my area,
22  my direct area, my work area helping me.  Sometimes he
23  would be in that area.  Sometimes he would be in the tire
24  center depending how our schedule was written that week.

Page 76

1   Q.   So he wasn't always around you?
2   A.   No.
3   Q.   Was he back with the tire technicians?
4   A.   Sometimes, and sometimes he would be in the --
5   in the sales floor with me.
6   Q.   How often would you say you interacted with
7   Mr. Revis on a typical day?
8   A.   I avoided Mr. Revis as often as I possibly
9   could.  Anything other than talking tires, that was
10  basically it for me.
11  Q.   I'd like to turn your attention to paragraph 18
12  of the complaint.
13       You said that after complaining regarding
14  your disparate treatment you suffered retaliation and
15  harassment by Mr. Revis and by other male supervisors and
16  coworkers; is that correct?
17  A.   The coworkers part, no; the supervisor, yes,
18  because I was complaining to Mr. Stone about my work
19  schedule being I'm a single parent and my mother, we all
20  live there with my mother, but she's unable to drive.  I
21  mean, basically I'm her caregiver.
22       And I was telling Mr. Stone, you know --
23  our store hours had changed.  We were opening up at seven
24  in the morning.  They were scheduling me to be to work by

Page 77

1   seven.  And then when I told him I couldn't be there,
2   I'm, like, I can't come to work at 7:00.  My son's
3   preschool program doesn't even open until 7:30.  Okay.
4   8:00.  I can't be here by 8:00.  It's impossible for me
5   to drop him off at 7:30, come to Dover, drop my second
6   son off at day-care, and make it here by that time.
7        And his response to me was, "Well, we're in
8   business for Sam's Club and not Cassandra."  So on it
9   went.  So, of course, I accumulated attendance
10  infractions by being late.
11  Q.   So they didn't try to accommodate you at all?
12  A.   No.
13  Q.   You're saying that that's because you complained
14  of disparate treatment?
15  A.   I believe -- I believe it was because I
16  complained.
17  Q.   Complained about what?
18  A.   About Mr. -- about Mr. Revis and the way he was
19  treating me in that department.  And I know that
20  Mr. Stone also had knowledge that I had filed a complaint
21  against Sam's Club.
22  Q.   So are you saying that there was no harassment
23  or retaliation before the complaint?
24  A.   No.  I really -- I really don't think so.

20 (Pages 74 to 77)

Johnson                                    v.                      Wal-Mart Stores, Inc.
Cassandra Johnson                      C.A. # 04-1450 JJF                    May 24, 2005

Page 78

1    Q.  So no one harassed you before you filed a
2    complaint?
3    A.  No.
4    Q.  Why did you file the complaint with the EEOC?
5    A.  I filed the complaint because I couldn't get a
6    pay increase.
7    Q.  So did --
8    A.  The problem with Mr. Revis came after the fact.
9    And then they still wouldn't do anything about it.
10   Q.  To whom did you complain?
11   A.  About the pay increases?  With Mr. Stone and
12   with Cornell.
13   Q.  Did you ever complain to Mr. Revis?
14   A.  No.  He wasn't even there when I was asking for
15   a pay increase.  He didn't come until probably September
16   or October.
17   Q.  So did he know that you were complaining about
18   your pay?
19   A.  I really don't know what he knew.
20   Q.  Now, you claim that you suffered retaliation.
21   Who do you believe retaliated against you?
22   A.  When I first complained about Mr. Revis making
23   the comments he was, basically every little thing I did,
24   it wasn't good enough.

Page 79

1    And if I went on break and he thought I was
2    taking too long, he would -- he would get on the intercom
3    and start yelling my name across the store.  He would
4    call a member of management and told him to check my
5    time, whereas like I explained to a member of management
6    one day, you know, while he's doing that, I have a badge
7    on that has my name and "Sam's Club" and it's pretty much
8    impossible to walk through the club and not get stopped
9    by somebody and say, you know, Miss, can you help me find
10   such and such, or can you do this for me.  He evidently
11   didn't understand that.  So it became one thing after
12   another.
13   I went to management and I said, "Can you
14   please make him stop doing that?  I'm not off task.  I'm
15   doing what I'm supposed to be doing."  And after that, I
16   mean, still nothing was done about it.
17   Q.  How is it that you claim that he retaliated
18   against you?  What was the retaliation?
19   A.  By complaining to management about my work
20   performance whereas nobody had a problem with my work
21   performance before.  I hadn't had any coachings on you,
22   know, Cassandra, you're not doing this or, Cassandra,
23   you're not doing that until he came on.  I never was
24   coached about my work performance, but he just always had

Page 80

1    a complaint about me.
2    Q.  Now, do you know whether Mr. Revis knew that you
3    filed an EEOC charge?
4    A.  I really don't know.
5    Q.  You don't know.  Okay.
6    Is there anyone else that you claim
7    retaliated against you?
8    A.  Well, I hate to say Jeremy would know, but he
9    knew about my complaint to the EEOC and he still wouldn't
10   help me with my work schedules.  It's not like I was
11   asking for anything that I had before we changed our work
12   store hours.  I worked nine to five before.  It shouldn't
13   have been a problem with me going back to working nine to
14   five once the store hours changed.  They didn't have to
15   change my schedule at all.  They could have left it the
16   way it was.
17   But again, like he said, he was in business
18   for Sam's Club, not for me, whereas he could have at
19   least tried to come to some type of medium and he just
20   wouldn't.
21   Q.  Now, did you have scheduling problems before you
22   filed the complaint?
23   A.  I only had problems with my schedule when my
24   mother was sick.  That was about it.

Page 81

1    Q.  When was that?
2    A.  Probably from September of 2002 till maybe -- I
3    want January or February of 2003.
4    Q.  Did you need to discuss your schedule with
5    Mr. Stone at that time?
6    A.  No.
7    Q.  Okay.
8    A.  No.
9    Q.  So your schedule, there was no problems with
10   your schedule at that time?
11   A.  No, no.
12   Q.  You just had to --
13   A.  I just had days I missed because she was in the
14   hospital and I was trying to transition her from being in
15   the hospital to a nursing home for rehabilitation.
16   Q.  So is it your contention that you were having
17   problems with your schedule because you filed the
18   complaint with the EEOC?
19   A.  Yes.
20   Q.  Why?  What's the basis for that?
21   A.  Because it wouldn't have been, you know, unheard
22   of that they made, you know, made it so I could have came
23   in a little later or just changed my schedule completely.
24   I mean, it shouldn't have been a problem, but they made

21 (Pages 78 to 81)

Johnson                                              v.                          Wal-Mart Stores, Inc.
Cassandra Johnson                          C.A. # 04-1450 JJF                          May 24, 2005

Page 82

1    it into a problem.
2       Q.   Who is "they"?
3       A.   Basically management.  I mean, they would
4    control even if Mr. Revis said no, if once I went to
5    management, they could have changed the schedule if they
6    had wanted to.
7       Q.   Did they ever say anything to you about filing a
8    complaint with the EEOC?
9       A.   No, no.
10      Q.   How do you know they knew about it?
11      A.   Because I had an older team leader,
12   Mr. McReynolds, come to me and say, "Cassandra, I heard
13   you lost your lawsuit."  And I'm looking at him thinking,
14   I don't have any lawsuit.  And this is before I even got
15   a right-to-sue letter.  So somebody at Sam's Club knew.
16      Q.   But did he tell you who knew?
17      A.   No.
18      Q.   Did anybody else talk to you about it?
19      A.   No.
20      Q.   Are there any other people you claim retaliated
21   against you?
22      A.   No, not that I know of.
23      Q.   Any other retaliation that you claim that you
24   suffered --

Page 83

1       A.   No.
2       Q.   -- that we haven't covered?
3            What is the harassment that you claim that
4    you suffered?
5       A.   From Mr. Revis.
6       Q.   Okay.
7       A.   It's harassment having to go to work every day
8    and being forced to work in an uncomfortable environment,
9    and he made it uncomfortable for me every day with those
10   jokes and the way he treated me.
11      Q.   So you claim the jokes were every day?
12      A.   Every day.
13      Q.   What were the jokes?
14      A.   It was always about me being big.  Always.
15      Q.   Anybody else?
16      A.   Like I said, I really don't know what he said
17   because I tried to avoid him at every cost.  If it wasn't
18   something that I had to deal with him directly with, it's
19   not like I went into a room and started a conversation
20   with him.
21      Q.   Are you claiming that the jokes came because you
22   filed a complaint with the EEOC?
23      A.   That's not what I'm saying.  I never told him
24   that I filed a claim.  As far as I knew, he didn't know

Page 84

1    that I filed a claim.
2       Q.   So why do you think he began harassing you?
3       A.   It was just in his personality to do it.  I
4    mean, when he came in, he came in being obnoxious from
5    the day he started.
6       Q.   He started when?  I'm sorry.
7       A.   I want to say at the end of September, but
8    I'm -- I'm not certain whether it was the end of
9    September, maybe October of -- probably 2003.  I'm not
10   certain.
11      Q.   You said there's no one else that retaliated
12   against you or harassed you other than Mr. Stone or
13   Mr. Revis; is that right?
14      A.   Yes.
15      Q.   Do you know whether either of them were ever
16   disciplined for their actions?
17      A.   I really don't know.
18      Q.   Do you know whether they were coached?
19      A.   I don't know.
20      Q.   How often would you interact with Mr. Stone?
21      A.   I see him in the club, say "Good morning," I go
22   to my work area.  Or if he needed something, he would
23   call me on my desk phone and say, Cassandra, I need you
24   to do this, or can you take care of this, or can you ask

Page 85

1    one of the guys to do this.  Other than that, that was
2    our basic interaction.
3       Q.   Now, do you contend that Mr. Stone ever harassed
4    you?
5       A.   Not directly, no, other than -- other than that
6    scheduling stuff, that's about it.
7       Q.   Now, did you ever complain about the
8    retaliation?
9       A.   No.
10      Q.   Did you ever complain about the harassment?
11      A.   As far as Mr. Revis, yeah, I did.
12      Q.   To whom did you complain?
13      A.   To Lakeria, Neosha, Jeremy, and Cornell.  Of
14   course, one time when I called to the home office, the
15   call was fielded back to him.
16      Q.   Now, would you be told what would happen with
17   those kinds of things?
18      A.   No.
19      Q.   So Mr. Revis may have been disciplined?
20      A.   I really don't know whether he was or not.
21      Q.   Now, is Mr. Revis still in your department?
22      A.   No.  He's working overnight as far as I know in
23   another department.
24      Q.   When did that occur?

22 (Pages 82 to 85)

Johnson                                    v.                     Wal-Mart Stores, Inc.
Cassandra Johnson               C.A. # 04-1450 JJF                      May 24, 2005

Page 86

1    A.   Maybe March.
2    Q.   Do you know why?
3    A.   No, I don't.
4    Q.   Paragraph 19 of your complaint, you allege that
5    you continued to suffer harassment on the basis of your
6    sex as well as in retaliation for complaints regarding
7    sex discrimination.
8         Is there anything other than what we've
9    already covered?
10   A.   No, I guess not.
11   Q.   So who is it exactly at Wal-Mart that you
12   believe discriminated against you?
13   A.   I believe it was both my immediate supervisors,
14   both Jeremy and Johnny.
15   Q.   They are the people that you contend retaliated
16   or harassed you?
17   A.   No, nobody that I worked directly with, no.
18   Q.   They didn't retaliate against you?
19   A.   I'm sorry?
20   Q.   Retaliate against you.
21   A.   Say the question one more time.
22   Q.   Who are the people that you believe retaliated
23   against you?  I believe you said it was those same two
24   people?

Page 87

1    A.   Those same two.
2    Q.   The harassment you claim is only Mr. Revis?
3    A.   Yes.
4    Q.   Was there any other discrimination, harassment,
5    or retaliation other than what we've already covered?
6    A.   No.  I mean, the last instance that I remember
7    was probably in February when one morning we were
8    stocking tires and I -- the guy that was stocking,
9    Johnny, was sitting on a bench tying his shoe up and I
10   was changing signs on our batteries.  And he pulled out a
11   piece of paper out of his back pocket with a full-figured
12   woman provocatively posed, and on it it had a little
13   bubble that said, "This is what happens to your ass when
14   you eat lard."  But that was about the last instance.
15   Q.   That was in February?
16   A.   I believe February or March.
17   Q.   Did he ever do anything like that before?
18   A.   No.  It was just mostly just the jokes.
19   Q.   Do you like your job?
20   A.   I love my job.
21   Q.   Do you like the people you work with?
22   A.   Most of the time, other than the times when we
23   have problems with our schedule where we are shorthanded,
24   those are probably about the most stressful times we have

Page 88

1    in that department.  That's it.
2    Q.   What damages do you believe you suffered as a
3    result of this litigation?
4    A.   It's basically been mentally taxing having to go
5    to work and work in that environment every single day and
6    just be uncertain of what's next to come.
7         I mean, some days I would have to sit in
8    the car and say a silent prayer just before I could get
9    out of the car because I knew that those days were the
10   days I had to work with him and I just didn't know what
11   was coming at me next.
12   Q.   What kind of symptoms?  Have you had any
13   symptoms?
14   A.   I mean, other than being depressed some days
15   and, like I said, my hair was falling out for a short
16   time.  I mean, other than that, no.  I mean...
17   Q.   Did you ever see any doctors for that?
18   A.   For my hair falling out?  No.
19   Q.   Or for the emotional --
20   A.   For the depression, no, no.
21   Q.   Any medication?
22   A.   No.
23   Q.   Do you contend that you are still being paid
24   unequally to your male coworkers?

Page 89

.1   A.   I don't want to say yes because most of the guys
2    that are in my shop now are all new.  It's not even one
3    guy out there other than Greg Scott that has been there
4    for a while.  The rest are all new, so I would probably
5    make way more money than they do.
6    Q.   Since when do you believe that that stopped?
7    A.   Probably -- probably when the last of them, the
8    older crew left, which would have been Kevin Rash and
9    Robert McKlinsey.
10   Q.   .When was that?
11   A.   They've probably been gone both for maybe a
12   year.  Eight months to a year, probably.
13   Q.   Is it your contention that the harassment
14   stopped, as well?
15   A.   Now that Mr. Revis is gone, yes.
16   Q.   Do you have anything else in your life that
17   causes you stress?
18   A.   Not really.  I deal with same daily issues
19   everyone else does.  I've got two kids and the stress of
20   getting them to school and picking them up and my
21   mother's health issues, but that's no more than anyone
22   else has to deal with.
23   Q.   You said for a little while your hair was
24   falling out.  Do you recall when that was?

23 (Pages 86 to 89)

B24

Johnson                                v.                    Wal-Mart Stores, Inc.
Cassandra Johnson              C.A. # 04-1450 JJF                  May 24, 2005

Page 90

1   A.  Probably -- probably the summer of 2003.
2   Q.  Did you have a car accident at some point?
3   A.  I did.  April of last year.
4   Q.  That's 2004?
5   A.  Yes.
6   Q.  Did you have any injuries as a result of that?
7   A.  I tore a ligament in my shoulder and hurt my
8   back.
9   Q.  Did that cause you to miss work?
10  A.  I did.  Probably for about -- probably about a
11  month, if that.
12  Q.  Were you ever married?
13  A.  No.
14  Q.  When is it that you first sought counsel
15  regarding this litigation?
16  A.  Probably October of 2003.
17      MS. GOLD:  I think I would just like to
18  take a five-minute break.  I may be done.
19      MR. PRIMOS:  Okay.
20      (A recess was taken at this time.)
21      MS. GOLD:  I have no further questions.  I
22  don't know if you have any.
23      MR. PRIMOS:  I just have a few.
24      MS. GOLD:  Okay.

Page 91

1   BY MR. PRIMOS:
2   Q.  Miss Johnson, there was some discussion early in
3   your testimony about your employment at Kent Crest.
4       Now, did you resign from that position or
5   were you terminated?
6   A.  I was terminated.
7   Q.  You were terminated.  Okay.
8       Now, at some point you were looking at the
9   job descriptions of the tire cashier and the tire
10  technician.  I believe you testified that the job
11  description of your position, the tire cashier position,
12  was accurate as far as what you do.
13  A.  Yes.
14  Q.  Just to clarify, Miss Johnson, isn't it true
15  that there are some duties that you perform when you are
16  helping out in the tire shop that are not listed here?
17  A.  Yes, there are.
18  Q.  So in that respect the job description would be
19  incomplete?
20  A.  Basically, yes.
21  Q.  So would it be fair to say that you performed
22  the duties listed on this tire cashier job description,
23  and in addition you performed some of the duties listed
24  on the tire technician job description?

Page 92

1   A.  Yes, I did.
2   Q.  Now, at one point you said that you do
3   everything that the tire technicians do except for
4   physically mounting tires?
5   A.  Yes.
6   Q.  But I thought at another point in your
7   deposition you said that you do mount the tires.
8   A.  If needed, I can mount tires.  I have mounted
9   tires on vehicles and just the -- just the rims, also.
10  Q.  So what did you mean when you say you do not
11  physically mount tires?
12  A.  I don't do it on a daily basis.  I can do it and
13  I have done it, but I don't do it on a daily basis.
14  Q.  But during occasions in the tire shop when the
15  tire shop has been short staffed, have you done it more
16  frequently?
17  A.  Yes.
18  Q.  In other words, you have physically mounted
19  tires more frequently?
20  A.  I have physically mounted tires, yes.
21  Q.  There was some testimony about Mr. Revis'
22  comments to you and jokes directed at you regarding your
23  weight.  I don't think we went into this very much, but
24  you indicated something about the physical condition of

Page 93

1   some of the male employees in the department.
2   A.  Yes.  They're not all physically fit.  It's not
3   like I'm working with all male models.  So if he felt
4   like he needed to tell a joke, it's not like he didn't
5   have material out in the shop.  He just chose me out of
6   the group.
7   Q.  Would some of the male workers in the
8   department, during the period, maybe not necessarily just
9   now, but during the period that you've worked in the
10  department and during this period that Mr. Revis was
11  joking, would they be described as overweight?
12  A.  Not all of them, no.
13  Q.  But some of them?
14  A.  But a couple of them, yes.  To be honest with
15  you, I doubt if they would have tolerated it as long as I
16  did, so he knew who to direct it at.
17  Q.  Now, during the period of time that Mr. Revis
18  was directing these jokes towards you, were there any
19  other female employees in the tire department besides
20  yourself?
21  A.  No.
22      MR. PRIMOS:  I have no further questions.
23      MS. GOLD:  Just a couple follow-up.
24

24 (Pages 90 to 93)

Johnson
Cassandra Johnson

v.

C.A. # 04-1450 JJF

Wal-Mart Stores, Inc.
May 24, 2005

Page 94

1  BY MS. GOLD:

2      Q.  So how often do you think that you have mounted

3  tires?

4      A.  It's not often.  Like I said, it's only if

5  someone is, you know -- if it's short staffed out there,

6  somebody is out there working by theirselves, I may go

7  out there and help them.  It's not demanded of me, but to

8  me it's just being a cashier there in that area, I choose

9  not to leave them out there by theirselves, so I may go

10  out and help them.

11      Q.  The other males in the department, do you know

12  whether Mr. Revis ever joked with them?

13      A.  Not for certain, no.

14          MS. GOLD:  I have no further questions.

15          MR. PRIMOS:  I have nothing further.

16          We'll waive reading and signing.

17          (The deposition was then concluded at

18  12:10 p.m.)

19

20          - - - - -

21

22

23

24

Page 95

1      INDEX TO TESTIMONY

2

3

CASSANDRA JOHNSON                    PAGE

4

5  Examination by Ms. Gold                 2
   Examination by Mr. Primos              91
6  Examination by Ms. Gold               94

7

8          - - - - -

9      INDEX TO EXHIBITS

10

JOHNSON EXHIBIT NO.:                  PAGE

11

12  1  A one-page copy of an Acknowledgment signed
       by Cassandra Johnson on 8/14/03         27

13

    2  A two-page copy of a document entitled
14     "Job Description, Tire Cashier"        28
15  3  A two-page copy of a document entitled
       "Job Description, Tire Technician"     28

16

    4  A one-page copy of a Charge of Discrimination  33

17

    5  A three-page copy of an EEOC Affidavit dated
18     November 18, 2003                      33
19  6  A two-page copy of "Plaintiff's Initial
       Disclosures"                           34

20

    7  A three-page copy of "Plaintiff's Answers to
21     Defendant's First Set of Interrogatories"  50
22  8  A multipage copy of Plaintiff's Response to
       Defendant's First Request for Production of
23     Documents                              51
24  9  A five-page copy of a Complaint        57

Page 96

1  State of Delaware )

2  New Castle County )

3                  CERTIFICATE OF REPORTER

4

5      I, Kathleen White Palmer, Registered Merit

   Reporter, do hereby certify that there came before me on

6  the 24th day of May, 2005, the deponent herein, CASSANDRA

   JOHNSON, who was duly sworn by me and thereafter examined

7  by counsel for the respective parties; that the questions

   asked of said deponent and the answers given were taken

8  down by me in Stenotype notes and thereafter transcribed

   into typewriting under my direction.

9

       I further certify that the foregoing is a true

10  and correct transcript of the testimony given at said

    examination of said witness.

11

       I further certify that reading and signing of

12  the deposition were waived by the deponent and counsel.

13      I further certify that I am not counsel,

    attorney, or relative of either party, or otherwise

14  interested in the event of this suit.

15

16

17

18

19          Kathleen White Palmer, RPR, RMR

            Certification No. 149-RPR

20          (Expires January 31, 2008)

21

22  DATED:  May 25, 2005

23

24

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

B26