# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CASSANDRA JOHNSON    \*

               \*

    Plaintiff,      \*      CIVIL ACTION

               \*      NO. 04-1450 (JJF)

v.              \*

               \*

WAL-MART STORES, INC.,    \*

               \*

    Defendant.     \*

## AFFIDAVIT OF CASSANDRA JOHNSON

STATE OF DELAWARE  \*

               \*   SS

COUNTY OF *Kent*    \*

    BE IT REMEMBERED, that on this _25_ day of _November_____, A.D.,

2005, personally appeared before me, the Subscriber, a Notary Public in and for the State and

County aforesaid, Cassandra Johnson who, being by me duly sworn according to law, did depose

and say:

    1.    I certify that I am over the age of eighteen years and am competent to make such

an affidavit.

    2.    I certify that my direct supervisor, Johnny Revis, singled me out as the subject of

numerous derogatory and demeaning comments on multiple occasions.  Mr. Revis did not make

such pointed and demeaning comments to the male employees in the tire center at Wal-Mart

where I worked.

B27

3.    The comments Mr. Revis made were primarily belittling comments concerning my weight. As an example of one of these comments, Mr. Revis on one occasion referred to me as a "big bear" in front of my co-worker, Lakeria Bryant, and a customer. I did not hear Mr. Revis make any comments about the weight of the male employees in the tire department.

4.    Mr. Revis also sarcastically referred to me as "The Genius" when he had to refer other employees to me to answer questions about store policy or procedure to which he did not know the answer. Specifically, Mr. Revis would tell these employees, "I don't know. Why don't you go ask 'The Genius'?"

5.    In addition, at one point, Mr. Revis brought in a picture of a large, scantily-clad woman and showed it to me.

6.    Mr. Revis also became excessively angry with me for not telling him exactly when I was taking my lunch break. In particular, on January 24, 2004 when I took my lunch break, Mr. Revis became extremely angry and accused me of leaving half an hour earlier than I had actually left. Mr. Revis was also angry that I had not informed him exactly where I was going for my break.

7.    I certify that I, on multiple occasions, reported Mr. Revis's behavior to management personnel at Wal-Mart. I informed my supervisors numerous times beginning at the end of 2003 about Mr. Revis's continued and repeated comments but no one took any action to stop Mr. Revis.

8.    In particular, I met with my manager, Jeremy Stone, on January 29, 2004 to complain about Mr. Revis's treatment of me. Instead of taking any action to remedy the situation, however, Mr. Stone advised me just to make fun of Mr. Revis in return.

9.    On January 30, 2004, I called the home office about the conversation I had had the previous day with Mr. Stone. I reported Mr. Revis's behavior towards me and also reported my frustration with my supervisors' inaction in this matter. The woman with whom I spoke at the home office then sent an e-mail to Cornell Randolph, the manager of the Dover Sam's Club.

10.    That same day, January 30th, I met with Mr. Randolph about Mr. Revis's actions. Mr. Randolph, however, only justified and excused Mr. Revis's behavior. Mr. Randolph told me that I should be accountable to Mr. Revis and should tell Mr. Revis when I was taking my break and where I was going any time I left the department. No other employee had to report this closely to Mr. Revis. No action was taken to correct Mr. Revis's behavior.

11.    I further certify that I perform a substantial amount of physical work in my job in the tire center, both at the cashier desk and in the tire shop as a certified tire technician. My work involves stocking and pulling down tires as well as carrying the tires to the shop for installation. In addition, I am required, on a regular basis, to go outside to inspect customers' cars to determine which type of tire the customer needs. Further, I am required to help install tires on on as-needed basis.

Cassandra Johnson

SWORN TO AND SUBSCRIBED before me the day and year aforesaid.

NotaryPublic

B29

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CASSANDRA JOHNSON,                        :

        Plaintiff,                        :

                       :

      v.                        :          CIVIL ACTION
                       :          NO. 04-1450 (JJF)

WAL-MART STORES, INC.,                    :

        Defendant.                        :

## DECLARATION OF CORNELL RANDOLPH

       I, Cornell Randolph, am the manager of the Dover, Delaware Sam's Club, and I,

pursuant to 28 U.S.C. § 1746, state the following based on my personal knowledge:

      1.     Pay rates at the Dover, Delaware Sam's Club are based on three factors: (1) the

nature of the position; (2) the individual skills that the associate brings to the job through prior

experience; and (3) performance.

      2.     Seniority is relevant to pay rates at the Dover, Delaware Sam's Club only to the

extent that pay increases accrue over time.

      3.     Different positions have different minimum rates of pay.  For example, reflecting

the significant differences in skills, responsibilities, and working conditions, in the beginning of

2004, the minimum start rate for tire technicians was $9.00 per hour, while the minimum starting

rate for tire cashiers was $7.70 per hour.

B30

4.    Although neither the tire technician nor tire cashier positions require prior experience, Wal-Mart values relevant prior experience. As a result, applicants with significant applicable work experience may receive a starting rate above the minimum rate.

5.    Performance can affect pay in two ways: (1) through annual pay increases; and (2) through merit raises.

6.    Wal-Mart provides annual performance evaluations, which not only establish goals, appraise an associate's performance, and serve as development/training plans, but also determine annual pay increases. More specifically, the employee's overall rating corresponds with a particular pay increase. For example, in the beginning of 2004, evaluations were based on a 16-point scale, with a rating of 16 meriting a $0.50 per hour raise; a rating of 14-15 meriting a $0.40 per hour raise; a rating of 13 meriting a $0.30 per hour raise; and a rating of 12 or lower resulting in no pay raise.

7.    Merit raises (*i.e.*, increases separate and apart from the annual pay raise) are rare, and are given only to those employees who demonstrate exceptional performance.

8.    Associates who are not meeting expectations in attendance or who have had a coaching since the last performance evaluation are not eligible for a merit raise.

9.    Employees may ask their manager to recommend a merit raise or managers can request merit raises on behalf of employees. Managers must use discretion in granting merit raises and are guided by their personal knowledge of employee contributions to Wal-Mart.

10.    I have reviewed the evaluations of plaintiff, Johnny Revis, Nathan Gibson, Kevin Rash, and Myron Dennis and the payroll records of the store to confirm the performance and pay

rates set forth in the paragraphs below.  Those documents are attached as Exhibits G-Q (plaintiff),S (Revis),T-U (Gibson), V (Rash), and W (Dennis).

11.    Plaintiff started at the minimum pay rate for front-end cashiers in 1996, which was $6.50 per hour.

12.    In her 90-day evaluation, plaintiff earned a rating of "standard" and the rating's corresponding pay increase of $0.30 per hour, for a pay rate of $6.80 per hour.

13.    In March 1997, plaintiff received a six-month review in which she was advised that she had to "improve on selling extended warranties."

14.    In September 1997, plaintiff earned an above standard rating.  Correspondingly, she received a $0.40 per hour pay increase, for a pay rate of $7.20 per hour.  Nonetheless, plaintiff was instructed that she had to improve her "sense of urgency" in dealing with clients.

15.    In 1998, Wal-Mart again found plaintiff lacking in the area of urgency, but her performance still warranted an above standard rating and a $0.40 per hour pay increase, for a pay rate of $7.60 per hour.

16.    In June 1999, Wal-Mart promoted plaintiff from front-end cashier to membership and marketing and granted her a $0.50 per hour pay increase, for a pay rate of $8.10 per hour.

17.    In her 1999 evaluation, plaintiff again received an above average rating, but again was reminded that she had to improve her sense of urgency and sales.  Her 1999 pay increase was $0.40 per hour, for a pay rate of $8.50 per hour.

18.    In 2000, plaintiff's performance declined to average. Accordingly, she received a pay increase of $0.30 per hour, for a pay rate of $8.80.

19.    On March 12, 2001, before her 2001 annual review, plaintiff received a written coaching regarding insufficient credit sales that adversely impacted her productivity.

20.    On August 25, 2001, plaintiff transferred laterally to the position of tire cashier. In her 2001 evaluation, Wal-Mart noted that plaintiff failed to focus on "opportunities in credit contribution." Wal-Mart gave her a $0.40 per hour pay increase, for a pay rate of $9.20 per hour.

21.    In 2002, plaintiff again earned a $0.40 per hour pay increase, for a pay rate of $9.60 per hour. Wal-Mart management advised plaintiff that to receive a larger pay increase, she had to improve in the dependability/responsibility category by making herself more available.

22.    In her 2003 annual review, plaintiff again was rated as deficient in the dependability/responsibility sub-category and in the effort/initiative sub-category of the "strive for excellence" category. Nonetheless, she still qualified for, and received, a $0.40 per hour pay increase, for a pay rate of $10.00 per hour. That rate was $2.30 per hour above the minimum starting rate for the tire cashier position at that time.

23.    As a result of an internal assessment done by Wal-Mart, many positions received pay increases during the summer of 2004, including plaintiff's position. Plaintiff received a $0.66 per hour pay increase at that time, for a pay rate of $10.66 per hour.

24.    In her 2004 annual review, plaintiff was rated as lacking in the effort/initiative sub-category of the "strive for excellence" category and the proper dress code sub-category of

"service to the member" category. Yet plaintiff qualified for and received an additional $0.40 per hour pay increase for a pay rate of $11.06 per hour.

25.    As set forth above, plaintiff's performance has not been exceptional. Consequently, she has not earned a merit raise. Additionally, as stated in several evaluations, plaintiff has failed to meet Wal-Mart's attendance standards, which precluded her from receiving a merit raise.

26.    Plaintiff did not have any prior experience that would have warranted her receiving a rate of pay above the minimum rate of pay when she started at Wal-Mart.

27.    Wal-Mart actively recruited Johnny Revis because he had substantial related work experience as both a tire technician and a supervisor of a tire department.

28.    On August 6, 2003, Wal-Mart hired Mr. Revis as a tire technician at a starting pay rate of $10.00 per hour ($1.00 per hour above the minimum $9.00 per hour for tire technicians) based on his prior experience.

29.    Mr. Revis' 90 Day Evaluation was perfect, warranting a $0.50 per hour pay increase, for a pay rate of $10.50 per hour.

30.    In November 2003, Mr. Revis was promoted to the team lead position -- a position for which plaintiff did not apply. As team lead, Mr. Revis earned a pay increase of $0.50 per hour, for a pay rate of $11.00 per hour.

31.    Mr. Revis continued to receive exceptional evaluations, warranting pay raises consistent with those evaluations.

B 34

32.    Wal-Mart hired Nathan Gibson in April 1998 as a tire technician at a starting rate of pay of $6.50 per hour.  At that time, plaintiff's rate of pay was $7.20 per hour and was increased to $7.60 later that year.

33.    Mr. Gibson received two $0.40 per hour annual increases and four $0.50 per hour increases over the course of his employment.

34.    In 2002 and 2003, Mr. Gibson's performance evaluations were perfect.  In recognition of his consistent exceptional performance, Mr. Gibson received three merit increases during his employment.

35.    Kevin Rash, who started as a tire technician at Wal-Mart before plaintiff, likewise has had consistently above standard and exceptional performance ratings, including a number of perfect evaluations, which have warranted $0.40 and $0.50 increases throughout his employment with Wal-Mart.  After receiving another exceptional evaluation in 2004, Mr. Rash's rate of pay was $12.40 per hour.

36.    Wal-Mart hired Myron Dennis as a tire technician on June 19, 2002 at a rate of $9.00 per hour.

37.    Mr. Dennis received one $0.50 per hour pay increase and one $0.40 per hour pay increase, but at no time earned more than plaintiff.

38.    Following the filing of her charge of discrimination, plaintiff was not transferred, disciplined, demoted or subjected to any other change in working conditions.

39.    I declare under penalty of perjury that the foregoing is true and correct.

Executed on this _____ day of October, 2005

_____

Cornell Randolph

39.   I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 27 day of October, 2005

Cornell Randolph

B37



1.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CASSANDRA JOHNSON,                    )
        Plaintiff,                    )
                                      )
              v.                      )  C.A. No.
                                      )  04-1450 (JJF)
WAL-MART STORES, INC.,                )
a Delaware corporation,               )
        Defendant.                    )

              Deposition of **JOHNNY REVIS**, taken
before Cheryl A. Anthony, Court Reporter, in the law
offices of Schmittinger & Rodriguez, 414 South State
Street, Dover, Delaware, on Wednesday, June 22, 2005,
beginning at 9:35 a.m.

APPEARANCES:

        SCHMITTINGER & RODRIGUEZ, PA
        BY:  NOEL E. PRIMOS, ESQUIRE
        414 South State Street
        Dover, Delaware  19901
        Attorney for Plaintiffs.

        BALLARD, SPAHR, ANDERS & INGERSOLL, LLP
        BY:  FARRAH I. GOLD, ESQUIRE
        919 North Market Street
        17th Floor
        Wilmington, Delaware  19801
        Attorney for Defendant.


        ORIGINAL RETAINED BY NOEL E. PRIMOS, ESQUIRE
_____

**ANTHONY REPORTING**
PO Box 234
Dover, Delaware  19903
(302) 674-8884

29

1  tell jokes?

2          A.    Well, I joke with everybody.

3          Q.    That is just your personality?

4          A.    That is just my personality, yes, sir.

5          Q.    Did you ever direct your jokes particularly

6  at Ms. Johnson?

7          A.    No.

8          Q.    You never did?

9          A.    No.

10          Q.    Did you ever make any comments about

11  Ms. Johnson's weight?

12          A.    No.

13          Q.    You never did?

14          A.    No.

15          Q.    Did you ever refer to Ms. Johnson as a bear?

16          A.    Us guys, we was talking about what kind of

17  animal do each of us look like.  I said I look like

18  so-and-so, and so-and-so say they look like this.  And

19  someone says:  What do you think Cassandra looks like?

20  I said a big bear, and that was all.  It was just a joke

21  thing.  We all had a conversation.  That's it.  It was

22  over with.

23          Q.    Okay.  You said that Ms. Johnson looked like

24  a big bear.  Now, was Ms. Johnson present when you said

30

1    that?

2        A.    No.

3        Q.    She wasn't present?

4        A.    No.

5        Q.    It was just the men in the department that

6    were present?

7        A.    Yes.

8        Q.    Now, when you said that, did they laugh?

9        A.    Yes.  We all laughed.

10       Q.    They all laughed?

11       A.    Yes.  We all laughed.

12       Q.    Okay.  Do you ever remember an occasion

13   where Ms. Johnson had been out in the heat -- it was in

14   the summertime -- and she had been out and she had

15   gotten hot and maybe a little sweaty.  And there was

16   like a pole or a wall in the inside area and she was

17   sort of scratching herself against this pole, and you

18   said:  That is what bears do?

19       A.    No.

20       Q.    You never said that?

21       A.    No.

22       Q.    Okay.  During this conversation when you

23   were comparing employees to different animals, do you

24   remember anything that you said about any other employee

31

1    besides Ms. Johnson, as far as comparing them to an

2    animal?

3         A.    What do you mean by that?

4         Q.    You said that Ms. Johnson reminded you of a

5    big bear, and everyone laughed.  Do you remember a

6    comparison that you made with any other employee, like

7    you look like a such-and-such and you remind me of a

8    such-and-such?

9         A.    What do you mean?

10        Q.    Like was there another employee that you

11   said:  You remind me of a cat?

12        A.    Yes.  Jeremy said I look like a seal.  I

13   said:  That's pretty good.  I look like an old sea lion.

14   I said yeah.  We was laughing.

15        Q.    I understand.  But we are talking about what

16   you said that someone else looked like.  Other than

17   Ms. Johnson and you said she looked like a big bear, did

18   you say anyone else looked like a particular type of

19   animal?

20        A.    I might have had.  I could have told Gary:

21   You look like Tweety Bird.  And he said:  All right.  I

22   will take that.  We were laughing and having a

23   conversation.

24        Q.    There was one male employee that you said he

32

1    looked look Tweety Bird?

2        A.    Yes.  We were all laughing.

3        Q.    I am trying to --

4        A.    I understand.

5        Q.    I am trying to find out.  Specifically, were

6    there any other employees that you indicated they

7    reminded you of a particular type of animal?

8        A.    Yes.  There was quite a few.

9        Q.    Can you give me some specific examples in

10   that conversation?

11       A.    I told Gary he looked like Tweety Bird.  We

12   joked around.  He said:  Well, you look like so-and-so.

13       Q.    Now, when you say so-and-so, he said, you

14   look like so-and-so, what?  You look like what animal?

15       A.    Then I said --

16       Q.    No.  He didn't use so-and-so, because

17   so-and-so is not an animal.

18       A.    I said it to him.  That is a figure of

19   speech.

20       Q.    I understand.  But I'm trying to get you to

21   tell me or explain to me specific examples.  What was

22   said about different employees and what animals they

23   resembled in that conversation?

24       A.    Well, then I got Greg Scott.  He said he

B42

33

1    looked like a lion.  I said:  Yeah, you do a lot of

2    roaring.

3         Q.    Who said --

4         A.    Scott.

5         Q.    Who said who looked like a lion?

6         A.    Yes.  I said:  You represent a lion, because

7    you do a lot of roaring.  We were just having a friendly

8    conversation thing.  That's it.

9         Q.    You said to him:  You look like a lion,

10   because you do a lot of roaring?

11        A.    Yes.

12        Q.    When you said Ms. Johnson looked like a big

13   bear --

14        A.    No.

15        Q.    -- did you explain why you said that?

16        A.    No, not to my recollection.  I don't know.

17        Q.    Other than this comment that Ms. Johnson

18   looked like a big bear, did you ever make any comments

19   referring to her weight?

20        A.    No.

21        Q.    Did you ever make any comments about any

22   other employee's weight?

23        A.    No.

24        Q.    Do you remember a conversation that you had

34

1   with Ms. Johnson when you were the team lead, where you

2   showed her a picture of a full-figured woman --

3        A.    No.

4        Q.    -- and you made a comment about that?

5        A.    No.  I haven't showed nothing to

6   Ms. Johnson.

7        Q.    You didn't do what?

8        A.    I didn't show no pictures to Ms. Johnson.

9        Q.    Did you show a similar type picture to other

10   employees?

11       A.    To a couple of boys in the back.

12       Q.    You showed a full-figured woman picture to

13   the boys in the back?

14       A.    Yes.

15       Q.    When was that?  Do you remember?

16       A.    No.  I can't remember that.  It was just

17   something I showed to the guys in the back.  And then

18   they said: I don't believe this.

19       Q.    Who said: I don't believe this?

20       A.    The guys in the back, I was showing it to

21   them.  We was all standing around.  And I said:  I got

22   this.  My cousin gave it to me off the Internet.

23             And I said:  Look at this.  They looked at

24   it, and they said:  This ain't real.  I said:  All

35

1  right.  We got to get to work, you all.  I took the

2  paper and threw it in the trash.  We were all done with

3  that.

4      Q.    Did you all have some laughs over it?

5      A.    Yes.  We all had some laughs.  We were like:

6  Wow.  Someone must have made it up.  That was it.

7      Q.    And when you showed this to the guys, did

8  you say:  This looks like Ms. Johnson?

9      A.    No.  No, sir, no, sir.

10     Q.    Where was Ms. Johnson at the time?

11     A.    I think she was off that day.  To my

12  recollection, I think she was off.

13     Q.    But you are not sure?

14     A.    I am not sure, but she wasn't around where

15  we was at at that time, at that point.

16     Q.    Do you ever remember any occasions where

17  Ms. Johnson was somewhere else in the store and you were

18  speaking over the intercom, saying:  Ms. Johnson, where

19  are you?  You need to be here in the tire center?

20            Do you ever remember any occasions where

21  that happened?

22     A.    No.  All I called for is breaks, because

23  sometimes you take breaks too long.  That's all I do.  I

24  page them on the intercom and say:  You need to come to

# SAM'S CLUB Performance Evaluation – Field Hourly Associates

Effective May 1, 2002

| | | |
|---|---|---|
| NAME | KEVIN RASH | SOCIAL SECURITY # | | HIRE DATE | 4/1/1997 |
| POSITION | TIRE TECH | DEPT. NUMBER | | APPRAISAL PERIOD | YEARLY DUE 4/1/06 |
| JOB CLASS | 816 | CURRENT RATE | | NEW RATE | |

**Instructions:** Circle bullets that apply and record a rating for each category. To qualify as a Yes, the associate must demonstrate 4 out of 5 bullets.

| | Yes/No |
|---|---|
| **1. Communication**<br>*Expresses ideas clearly and positively (written and/or verbal).<br>*Actively listens and asks questions if unclear. *Keeps others informed. | |

- Your coach/manager is kept informed of the decisions you make in your job.
- Your coach/manager knows what you are struggling with and what is working well.
- You ask questions when you don't know something or need additional information.
- Customers have/develop a positive and professional image of your department during/after your communication with them.
- You maintain appropriate records and documentation necessary for your job.

| | Yes/No |
|---|---|
| **2. Team Work**<br>*Willing to teach others to meet dept goals. *Shares workload.<br>*Works well in a group, equally contributes to the overall goal/task. *Cooperates w/others. | |

- Your coach/manager counts on you to help keep the team positive and productive.
- You complete your share of the workload and when finished, actively help others with their workload.
- You focus on and help achieve the team goals as well as you own.
- You have a positive working relationship with other team members.
- You participate in team meetings and champion a positive attitude and spirit.

| | Yes/No |
|---|---|
| **3. Honesty/Integrity**<br>*Maintains moral standards. *Demonstrates sincerity and a soundness in character.<br>*Is reliable and trustworthy. | |

- Your peers, managers and customers trust you.
- You are viewed as someone who will always do the right thing.
- You can be trusted with confidential business information and company assets.
- You challenge things that are wrong or unethical in an appropriate manner.
- You do not involve yourself and put a stop to harmful or nonproductive comments or gossip.

| | Yes/No |
|---|---|
| **4. Dependability/Responsibility**<br>*Follows up on work *Carries out assigned tasks *Accountable for work *Can be depended upon to be available and on time for work. ____<br>Days Absent ____ Days Tardy ____ | |

- Your peers and managers trust you to carry your share of the workload.
- Your coach/manager can count on you to be at work and on time.
- Your attendance is within company guidelines.
- No active coachings at any level.
- You follow up on projects or tasks until you are certain completion or closure is accomplished.

| | Yes/No |
|---|---|
| **5. Development**<br>*Strives to improve job skills. *Strives to improve the quality of work. *Is interested and understands their role in achieving budgeted numbers. | |

- You are viewed as well trained for your position because of your productivity, accuracy and job knowledge.
- Others ask you questions when they need information about how to do their job well.
- You have been cross-trained to do at least one other position in your department and perform that position with a high level of skill.
- You have completed at least 2 training courses or you have achieved 2 certifications.
- You actively challenge yourself to learn more.

B 46    CONFIDENTIAL

Wal-Mart-Johnson<br>01455

Associate Evaluation Form (Cont.)

DISCUSS THE MAJOR AREAS OF JOB PERFORMANCE NEEDING IMPROVEMENT: _there is no_
_major area that need improvement. But need_
_to be 100% with shirt and doors in shop_
_____
_____

AREAS OF JOB PERFORMANCE IMPROVED SINCE LAST EVALUATION:
_Kevin has been to tie traing class_
_this year, and did very well in the test. He has_
_also improved on his seller skills this year._

ASSOCIATE'S PLAN OF ACTION:  ASSOCIATE, EXPLAIN THE STEPS YOU WILL TAKE TO IMPROVE ANY WEAK-
NESSES YOU MAY NOW HAVE:  _I will continue to make improvements in the_
_areas that are needed such as, keeping doors_
_closed and keeping shirt tucked in._

CAREER GOALS: _I plan to pursue a career in law-enforcement_
_____
_____
_____

ASSOCIATE'S COMMENTS: _Very pleased with my current_
_employement status._
_____
_____
_____

BASED ON THE ASSOCIATE'S PERFORMANCE OVER THE EVALUATION PERIOD, PLEASE CIRCLE THE APPRO-
PRIATE PERFORMANCE RATING:

EXCEPTIONAL     (ABOVE STANDARD)     STANDARD     BELOW STANDARD     MARGINAL

_____        _____        _____
Associate                    Supervisor                   Supervisor
$8.70                        $9.10                        3/11/98
Old Rate                     New Rate                     Date Signed

WPK/8070-128C/0787-4

Wal-Mart-Johnson
01434

EVALUATION SUMMARY

1.  Identify what you consider to be areas that require improvement. List how these
    areas are to be improved and time limits within which improvements should be
    recognized. If you have any problems with attendance, it should be covered here.

    *Kevin can give Sam better avalibility*

2.  Identify what you consider to be the major strengths of the associate. These could be
    personal attributes, job performance or technical skills.

    *Honest, dependable, Hard working*

3.  Discuss improvement made by associate since last review as related to recommendations
    for improvement.

CAREER GOALS
What are the associate's career goals? Does he/she desire to achieve higher job
responsibilties with the company? These comments should be made by the associate.

ASSOCIATE COMMENTS
Wal-Mart is a company which strongly believes in the "Open Door Policy" and we encourage
the associate to make any comments on this evaluation. If you have questions or problems,
feel free to discuss them with your supervisor. (Use blank sheet of paper for additional
comments).

*None*

New Rate of Pay     +40                    Effective Date     4/4/99

*Kevin R. Rich*          *R. McLeod*                      3/17/99
_____            _____                  _____
Associate                 Supervisor                    Date Signed

WPK/FMS207-S/0286M-4

Wal-Mart-Johnson
01439

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974

Delaware Department of Labor

| ENTER CHARGE NUMBER | |
|---|---|
| ☐ FEPA | 0312140 |
| ☐ EEOC | 17CA400137 |

and EEOC

(State, or local Agency, if any)

**NAME** (Indicate Mr., Mrs., Ms)
Ms. Cassandra Johnson

HOME TELEPHONE NO. (Include Area Code)
(302) 653-4192

**STREET ADDRESS**
120 Locust St.

**CITY, STATE AND ZIP CODE**
Smyrna, DE 19977

**COUNTY**
Kent

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one, list below.)

**NAME**
Sams Club #6330

NO. OF EMPLOYEES OR MEMBERS 25+

TELEPHONE NUMBER (Incl. Area Code)
(302) 678-4223

**STREET ADDRESS**
1527 N. Dupont HWY. Dover, DE 19901

CITY, STATE AND ZIP CODE

**NAME**

TELEPHONE NUMBER (Include Area Code)

**STREET ADDRESS**

CITY, STATE AND ZIP CODE

☐ RACE ☐ COLOR ☒ SEX ☐ RELIGION ☐ NATIONAL ORIGIN ☐ AGE

☐ RETALIATION ☐ DISABILITY ☐ OTHER (Specify)

DATE DISCRIMINATION TOOK PLACE
EARLIEST   9/1996
LATEST   11/18/2003 XXX
☒ CONTINUING ACTION

THE PARTICULARS ARE (If additional space is needed, attached extra sheet(s):

. I am a female individual who has been employed by Respondent since September 1996. I have worked as a Sales Associate n the Tire Department at Respondent's store #6330 for approximately 3 years. I am currently employed by Respondent; owever I am not paid the same as my male co-workers, even though I have more seniority than some of them.

. R..ondent has given me various reasons for not paying me equally or given me a merit raise.

I. I believe Respondent is in violation Title VII of the Civil Rights Act of 1964, as amended, and the state of Delaware's iscrimination in Employment Act, as amended, because they are not paying me equally to my male co-worker s or have not iven me a merit raise. I have been employed by Respondent in the Tire Department for approximately 3 years, longer than y Team Leader, Johnny Revis (male) and Tire Mounter, Memphis (last name unknown, male) but they are paid more than I n. I have been employed by Respondent for 7 years, two years more than Tire Mounter, Nathan Gibson (male) however he so is paid more than I am. I am expected to perform the same job duties of all the men but they are not expected to perform y specific job duties.

| I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | SIGNATURE OF COMPLAINANT |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| eclare under penalty of perjury that the foregoing is true and correct. | NOTARY - (When necessary to meet State and Local Requirements) |
| 11/18/03   Cassandra John Charging Party (Signature) | Subscribed and sworn to before me this date _____ (Day, month, and year) |

FORM 5
EV 6/92

PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE AND MUST NOT BE USED

Johnson
EXHIBIT NO. 4
KWP 5-24-05

03-993
PDoL

NAME: *Cassandra Johnson*          DATE: _____

## REMEDY INFORMATION

1.  If your charge alleges failure to hire or failure to promote, what was the salary or salary range of the job you applied for? $_____. What was the salary of the position you held at the time you applied for the position in question? $_____.

2.  If your charge alleges discharge or suspension without pay, what was the salary of the position you held at the time of discharge or suspension? $_____.

3.  If your charge alleges demotion, what was the salary of the position you held before you were demoted? $_____. After you were demoted? $_____.

4.  **Other than loss of salary,** what money have you lost as a result of the alleged discrimination (e.g., cost of looking for new job, cost of health insurance you had to buy, etc.)? Describe each type of loss and provide an approximate dollar value for each type of loss. (NOTE: You should save receipts or other proof of all such expenses.)

    _____

    _____

    _____

    _____

    _____

    _____


5.  **Other than monetary losses,** what losses have you incurred as a result of the alleged discrimination (e.g., loss of seniority, no longer being part of a pension plan, loss of company car, had to seek psychiatric services)?

    _____

    _____

    _____

    _____

B 50

REMEDY INFORMATION (pg. 2)

6.  What relief or remedy are you seeking in response to filing a charge with EEOC?

_I would like to continue working at the appropriate pay rate_
_and no loner have to endure fat jokes from my team_
_leader._

7.  If your charge alleges discharge or failure to hire, have you obtained other employment since the date of the alleged discrimination? If yes, please indicate the date of employment and the salary you earn with this new employer. (If there has been more that one employer, please indicate all dates of employment and salary with each employer since your date of discharge or the date you were denied hire by the employer named in your charge.)

I declare under penalty of perjury that I have read the above statements and that they are true and correct.

_Cassandra Joeh_
Signature                                    Date

B 51

notes

January 24, 2004

I went to work today at 9AM and worked until 2pm waiting for our area to slow down so that I could leave on my break & lunch. (On Saturdays I leave to get my children lunch)

I clocked out @ 2pm. When I returned (3pm) Lakeria stopped me to say that Mr. Revis was really mad because I left work at 1:30 pm and didn't tell anyone where I was going. I told Lakeria that I had left at 2 and that I let two of my co-workers know that I was leaving the building. I also told Lakeria to check my punches and she said that she had already checked when Mr. Revis came over to complain also at which point Lakeria pointed out that she noticed that there seemed to be a problem with Mr. Revis and myself. I expressed my frustration with Mr. Revis w/ Lakeria and she suggested that I bring the matter to Jeremy Stone's attention. Before I left for the day I spoke to Lakeria about the situation again and told her that I had already tried to talk to J. Stone and he had done nothing about Mr. Revis. Also I told Lakeria that Mr. Revis at times is unapproachable and when I try to talk to him our conversation turn into confrontation. Lakeria suggested that I try talking to our Club G.M.

B52

1/27 - 1/28
School
Closed
Bad Weather

January 29, 2004
    at 9Am today I paged Cornell Randolf to discuss my situation in the tire cent and Johnny Reris. When I spoke to him about Saterday he assured me that the four of us (Cornell, Jeremy, Johnny & myself) would sit down and work out things I expressed to him that I felt Johnnys complants were retaliation from Sept.
    After my lunch break J. Stone said that he had called Johnny to the coaches office to meet with us. Never once did Mr. Stone metion that I felt Johnnys actions were retaliation for the previous complant in Sept instead he kept saying "Cassandra feels pecked on". and made the excuse for Johnny that he came from Sears and hasn't learned all the Wal mart rules of conduct. And then suggested that each time I take a break, I need to let Johnny know were I'm going. No other partner in the area has to directly let Johnny know when they take breaks. In our 30-30 min meeting J Stone danced all around the issue of Mr. Reris and his inappropriate actions and instead justifyied his actions as running a tight ship.
Mr Stone said "How many years have you been in the tire center Cassandra. I answered 6 yrs. — Mr Stone said" and I honestly don't feel that the tire center has had an adequate team leader in that time, I feel things are

B53

running a lot better since Johnny has been
the teams leader." - I expressed my disagreement
with the statement by saying that it wasnt
the previous team leaders in the area, but
the quality of partners managment put
in the area. - The conversation
was straying from our main topic Mr. Revis
& myself, so I said to J. Stone that
when I try to speak to Johnny he
either brushes me off or we have a comfrontation
in which turn Johnny seed that it seems
as though he cant talk to me because I
use an angry tone but that he dednt
want me to think that he dedul like
me neither. He was unsure of how to approach
me, then he (Johnny) started rambling on
about trying to run the area like a team.
Again Johnny & Jermy still have not addressed
Mr. Revis actions & statements rather J. Stone
tried to change the situation to make me feel
childish for complaining by saying "Cassandra
feels picked on"

I assured Johnny & Jermy that I wasnt concerned
with club likes & dislikes and that I was there
to do my job. My comment was brought out
because mr.stone mad reference to a situation w/
Julie Nowak on Dec 23, 2003 when I brought to
her attention a mistake that had been made
when placeing a special order for tires and she accused me
of saying that she dednt know how to do her job.   B54

Again, I let Jeremy know that I didn't
have a problem w/ Julie or anyone else in
the club that I didn't feel that I could
go to and talk to about.
The only thing that came out of our
meeting was that I asked Mr Reeves instead
of brushing me off, when I come to him with
a concern, at least say that you will
get back to me or set a time during the day
to address concerns w/ partners, and please don't
just walk off from me when I'm trying to talk
to him.

BSS

January 30th, 2004

Approx 8:05AM

I called Home Office in regard to the conversations I had yesterday with J Stone & J. Revis because after thinking of the conversations I realized that nothing would be done about our situation in the Centers or Mr Revis' off colored humor and I was concerned because C Randolf assured me that he would meet with us and did not. When I called, I spoke to a woman named Carol. She asked me about my problem then I told her about the jokes and how management had handled the situation She responded by saying that Mr. Revis' were totally unacceptable and that they would not be tolerated and that the comments made by J. Stone also were unacceptable and would not be tolerated. Carol then said that she would send an E mail to the Director of Operations for club #6320 and I would have a response before the end of the day. ~~[scribbled out]~~

B56

January 30

Cornell called me into the coaches office
to respond to his E-Mail from Home Office.
He basically said the same things J Stone
had said the day before. In the office with
us was LaKena Bryant (manager). He said that
there has to be a level of accountability in
my work area, which is why I needed to let
Johnny know where I am at all times when I leave
my desk to do breaks or use the restroom when I don't
make it back from break or lunch when Johnny
thinks what my break is over. I need to explain
the reasons — I told him that it would not have
been an issue if that same level of accountability was
expected from the others in that area and not just me,
again Cornell stressed that in the past Johnny
has had some problems with relating to co-workers
and members but that he would be attending training
classes to correct his actions. Before leaving
the office Cornell asked if I needed to
address anymore concerns and I said
no.

B57

## CERTIFICATE OF SERVICE

I hereby certify that I have caused copies of the following:

### APPENDIX TO PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

to be served upon:    WILLIAM M. KELLEHER
                      Ballard Spahr Andrews & Ingersoll, LLP
                      919 Market Street, 12th Floor
                      Wilmington, DE 19801

                      DAVID S. FRYMAN
                      FARRAH I. GOLD
                      Ballard Spahr Andrews & Ingersoll, LLP
                      1735 Market Street, 51st Floor
                      Philadelphia, PA 19103

above, via electronic service, on ___11/30/05___.

                      SCHMITTINGER & RODRIGUEZ, P.A.

                      BY: _____
                          WILLIAM D. FLETCHER, JR.
                          Bar I.D. #362
                          NOEL E. PRIMOS, ESQUIRE
                          Bar I.D. #3124
                          414 S. State Street
                          P.O. Box 497
                          Dover, DE   19901
                          (302) 674-0140
                          Attorneys for Plaintiff

DATED: 11/30/05
NEP:acg